**PEOPLES BANK v. ECCLES et al.**

No. 9338.

United States Court of Appeals
District of Columbia.

Argued Nov. 27, 1946.

Decided April 14, 1947.

EDGERTON, Associate Justice, dissenting.

See also 64 F.Supp. 811.

Mr. Samuel B. Stewart, Jr., of New York City, for appellant.

Mr. Joseph William Burns, of Washington, D. C., also entered an appearance for appellant.

Mr. J. Leonard Townsend, Asst. Gen. Counsel, of Washington, D. C., Board of Governors of the Federal Reserve System, with whom Mr. Edward M. Curran, of Washington, D. C., U. S. Atty. at the time the brief was filed, was on the brief, for appellees.

Before EDGERTON, CLARK and WILBUR K. MILLER, Associate Justices.

WILBUR K. MILLER, Associate Justice.

The principal question in this case is whether a drastically restrictive condition upon a state bank's membership in the Federal Reserve System was validly imposed by the Board of Governors of the System. A secondary question is whether the state member bank is prevented by waiver or by estoppel from challenging the validity of the condition.

The Peoples Bank of Lakewood Village, California, was incorporated in 1941 under the laws of that state, after the State Superintendent of Banks had found that public convenience and advantage would be promoted by its establishment at the proposed location. A license actually to transact business would not be granted, the Superintendent advised, until deposit insurance had been obtained through membership in the Federal Deposit Insurance Corporation or in the Federal Reserve System. Accordingly, the Peoples Bank forwarded on November 28, 1941, an application for admission to the Federal Reserve System, using the printed form furnished by the System and supplying all the data thereby required.

In acting upon the application the Board of Governors considered the financial condition of the applying bank, the general character of its management, and whether the corporate powers were consistent with the purposes of the Act, as required by Title 12, § 322, U.S.C.A. In like manner the Board of Governors considered the financial history and condition of the bank, the adequacy of its capital structure, its future earnings' prospects, the general character of its management, the convenience and need of the community to be served by the bank, and whether its corporate powers were consistent with the purposes of the statute, as required by Title 12, § 264, subsections (e) (2) and (g). The bank, being fully qualified in those respects at the time of application, was eligible for membership in the Federal Reserve System, and the Board of Governors necessarily so found when it later permitted the institution to become a member.

But the bank was not immediately admitted. Under date of February 12, 1942, the secretary of the Board of Governors instructed the Federal Reserve Bank of San Francisco to inform the applicant that the Board "is unwilling to approve the application on the basis of the information now before it." No reason for the refusal was given, and its basis was not discovered by the Peoples Bank until late in February, 1942, when one of its directors had a personal conference in Washington with two members of the Board and its secretary. The director's affidavit includes the following: "During the course of my conversation with the said Board members and Secretary I recall that statements were made to the effect that Secretary Morgenthau was opposed to increasing the number of banking offices of Bank of America and that it was stated that there was considerable agitation against increasing the banking interests of bank holding companies— so much so, that there was a prospect that legislation would be introduced to curb the expansion of bank holding companies. It was also stated in substance that upon assurances that the Peoples Bank was independent of Bank of America and Transamerica Corporation the Board might be disposed to reconsider the application."

The bank asked the Board to reconsider, and furnished information concerning changes in the ownership of its shares which had occurred after the filing of its original application. By letter dated March 11, 1942, the Federal Reserve Bank of San Francisco informed the Peoples Bank "that the Board of Governors will be glad to reconsider your application upon a definite showing by the directors of your bank" that five conditions set out in the letter had been met. These conditions are shown in the margin.[1]

---

[1] "1. That arrangements have been made by Mr. John S. Griffith, San Marino, California, for financing the purchase of his stock in a manner different from that in effect at the time of our investigation of your bank's application for membership, and that such arrangements are consistent with the other provisions of this letter.

"2. That some change has been made in the arrangements for the use of the furniture and fixtures whereby the bank

The bank complied with those requirements. In meeting the third requirement contained in the letter of March 11, 1942, each shareholder of the bank signed the following letter: "I, the undersigned, being a stockholder of the Peoples Bank, Lakewood Village, California, do hereby state that I have no arrangements, expressed or implied, with respect to the sale or transfer of the stock of the Bank which I own to either the Transamerica Corporation, or any organization affiliated or closely identified with Transamerica Corporation, or any other Bank Holding Company group, and that I do not intend to enter into any such agreements or understandings."

Some weeks thereafter, on May 6, 1942, the Board approved the application for membership, subject to three conditions which it clearly had the statutory right to impose, and subject to a fourth condition which, sharply challenged, is the storm center of this litigation. The first three conditions, standard in character and usually imposed on state banks applying for membership, are shown in the margin.[2] Condition No. 4, which the appellant says not only is not standard, having never been imposed before or since, but invalid as well, is as follows: "4. If, without prior written approval of the Board of Governors of the Federal Reserve System, Transamerica Corporation or any unit of the Transamerica group, including Bank of America National Trust and Savings Association, or any holding company affiliate or any subsidiary thereof, acquires, directly or indirectly, through the mechanism of extension of loans for the purpose of acquiring bank stock, or in any other manner, any interest in such bank, other than such as may arise out of usual correspondent bank relationships, such bank, within 60 days after written notice from the Board of Governors of the Federal Reserve System, shall withdraw from membership in the Federal Reserve System."

Since the conditions in the commitment of May 6, 1942, were substantially those contained in the San Francisco Reserve Bank's letter of March 11, 1942, already met, no additional action by the appellant bank was necessary specifically to meet the formal conditions in the communication of May 6, 1942. Having been in other respects ready for many months to function as a banking institution, the Peoples Bank opened its doors and began business activity soon after it became a member of the System pursuant to the commitment.

In 1944, the proscribed Transamerica Corporation, without the knowledge or assistance of the bank, acquired 540 shares of its capital stock, being slightly more than

---

will be under no obligation to Capital Company or any other part of the Transamerica group.

"3. That neither Transamerica Corporation nor any organization affiliated or closely identified with Transamerica Corporation or any other bank holding company group has any interest, direct or indirect, in the applicant bank, and that the bank is in no manner obligated to any such organization.

"4. That all stockholders have stated in writing that they have no agreements or understandings, expressed or implied, with respect to the sale or transfer of the stock of the bank to any such organization, and that they do not intend to enter into any such agreements or understandings.

"5. That the bank was organized as a bona fide local, independent institution, and is expected to be continued as such."

2 "1. Such bank at all times shall conduct its business and exercise its powers with due regard to the safety of its depositors, and, except with the permission of the Board of Governors of the Federal Reserve System, such bank shall not cause or permit any change to be made in the general character of its business or in the scope of the corporate powers exercised by it at the time of admission to membership.

"2. The net capital and surplus funds of such bank shall be adequate in relation to the character and condition of its assets and to its deposit liabilities and other corporate responsibilities, and its capital shall not be reduced except with the permission of the Board of Governors of the Federal Reserve System.

"3. Such bank shall not engage as a business in issuing or selling either directly or indirectly, (through affiliated corporations or otherwise) notes, bonds, mortgages, certificates, or other evidences of indebtedness representing real estate loans or participations therein, either with or without a guarantee, indorsement, or other obligation of such bank or an affiliated corporation."

10 per cent of the total of the 5,000 shares authorized, issued and outstanding. The bank immediately reported that fact to the Board and asked to be relieved of Condition No. 4 which, in view of Transamerica's acquisition of stock, made it possible for the Board immediately to demand that the bank withdraw from the System. As withdrawal would result in automatic cancellation of deposit insurance, the bank regarded the literal enforcement of Condition No. 4 as a death sentence.

When the Board refused to revoke the provision, the Peoples Bank sued its members in the District Court of the United States for the District of Columbia to have the condition adjudged invalid, and to enjoin its enforcement.

The Board members moved to dismiss the complaint on the ground that it presented no justiciable controversy. After that motion had been denied,[3] an answer was filed pleading that the complaint showed on its face (a) that the bank was estopped to deny the validity of Condition No. 4, (b) that in imposing Condition No. 4 the Board exercised the administrative discretion confided to it by § 9 of the Federal Reserve Act,[4] and (c) the validity of Condition No. 4. With this answer in the record, the Board members moved for judgment on the pleadings. The bank countered with a motion for summary judgment and filed in support numerous affidavits and exhibits in which the factual background of the controversy is shown.

Upon consideration of the several motions, the District Court's opinion was that the bank "cannot now attack the validity of the condition to which it voluntarily agreed." Being of that view, the court entered judgment for the Board members, on the pleadings, and denied the bank's motion for summary judgment. The Peoples Bank appeals.

We first consider the question whether the Board of Governors had the power to attach Condition No. 4 to the membership of the Peoples Bank in the Federal Reserve System.

Under the literal language of the condition, the Board's right to expel the bank becomes absolute the moment Transamerica acquires a stock interest, without a previous finding that Transamerica's acquisition of shares would, or probably would, adversely affect the bank. Nor is the effectiveness of the Board's power to expel under Condition No. 4 made to depend upon the acquisition by Transamerica of a controlling interest in the bank. The ownership by that corporation of any number of shares, however small, sets the condition in motion and gives rise to the power of expulsion.

This striking denunciation of Transamerica makes pertinent an inquiry into the nature of that organization. The record discloses it to be a large corporation, owning extensive interests in many banks and in other corporations as well. It is a substantial stockholder in the Bank of America, which for several years has been one of the two or three largest banks in the nation. The financial soundness of Transamerica is not challenged. The character, integrity and ability of its management are not assailed. No statute, state or federal, forbids it to own shares of the Peoples Bank or any other bank.

The basis for the imposition of this unusual and unqualified prohibition against Transamerica's acquiring shares of the bank in question is shown by the record to be the fact that for some time federal bank regulatory authorities, including the Board, have regarded further expansion of Transamerica as undesirable and unsound. Moreover, we are so advised by the following statement in the appellees' brief: "In this case the record shows that the Board had reason to believe that appellant, at the time it applied for membership in the System, was under or was about to come under the management of Transamerica Corporation, the bank expansion program of which the Board, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation all believed to be unsound. Condition No. 4 was therefore designed to prevent that corporation from taking over ap-

---

[3] Peoples Bank v. Eccles, D.C., 64 F. Supp. 811.

[4] 12 U.S.C.A. § 321.

pellant's affairs *after* it came into the System."

The fact is, however, that the record does not show that the Board had reason to believe that appellant, at the time its application was filed, was under or was about to come under the management of Transamerica. The purpose of Condition No. 4, therefore, was primarily to check the growth of Transamerica, which the Board considered to be already too large.

Whether the Board of Governors has the power, in the effort to implement its theory that the enlargement of bank holding companies should be forbidden, to deny to Transamerica its right, otherwise entirely legal, to purchase and own shares in the Peoples Bank, depends on whether the Federal Reserve Act expressly or impliedly confers such authority. In other words, the validity of Condition No. 4 as a curb to the growth of a bank holding company depends upon whether the Congress intended to authorize the Board to arrest the extension of such companies.

 If such a legislative intent does not appear, grave doubt arises as to the right of the Board to form such an intent for itself. Furthermore, if a contrary intent on the part of Congress be found, unquestionably the Board's assumption of the power to check the expansion of bank holding companies amounts to an invasion of the legislative field. All the Board's power springs from the statute. An administrative agency may have a wide latitude within which to function, and may be authorized to prescribe regulations which must be observed by those subject to its jurisdiction. But its regulations must fall within the limits of the authorizing statute, and must be such as will carry into effect the will of Congress.[5] The broad discretion confided to the Board of Governors continues only so long as it acts within its statutory scope. When the Board reaches the border of the Federal Reserve Act it must stop, for to go beyond would be to impinge on Congressional prerogatives.

We turn to the Federal Reserve Act to see whether it manifests an intent on the part of Congress to forbid bank holding companies to expand, either by prohibiting them from owning minority stock interests in state member banks, or by the use of any other device. We find no such prohibition. The Act goes no further, with respect to limiting the activity of a holding company, than to provide that one which owns a majority of the shares of a member bank may not vote such shares without first obtaining a permit from the Board of Governors. The Congress has thus expressly conferred upon the Board the right to supervise and curb a holding company when, through the ownership of a controlling interest, it is in a position to dominate a bank's management and to dictate its policy. It was not deemed necessary to give the Board the right to prevent or restrict voting by a holding company having less than a majority interest, as no such provision appears in the statute. Obviously the legislators did not share the Board's apprehension that harm might come to a member bank from the votes of a holding company having less than control.

This limited statutory restriction upon bank holding companies, which contrasts strikingly with the broad restraint imposed by the Board in the present case, has added significance when considered in the light of certain legislative history of the Federal Reserve Act. From that history it is

---

5 Manhattan General Equipment Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80°L. Ed. 528, where the Supreme Court said: "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law for no such power can be delegated by Congress but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity. Lynch v. Tilden Produce Co., 265 U.S. 315, 320–322, 44 S.Ct. 488, 68 L.Ed. 1034; Miller v. United States, 294 U.S. 435, 439, 440, 55 S.Ct. 440, 79 L.Ed. 977, and cases cited. And not only must a regulation, in order to be valid, be consistent with the statute, but it must be reasonable. International Ry. Co. v. Davidson, 257 U.S. 506, 514, 42 S.Ct. 179, 66 L.Ed. 341."

learned that the Congress, quite deliberately and because of what it considered an abuse of a power which it had theretofore granted to the Board in broad general terms, provided that the Board of Governors may only impose such conditions upon a bank's admission to the System as are within and pursuant to the legislative intent in adopting the Act.

Prior to 1927, the governing body of the Federal Reserve System had the very broadest power to attach conditions to a bank's entry into the System. The statutory language[6] on the subject was: "The Federal Reserve Board, subject to such conditions as it may prescribe, may permit the applying bank to become a stockholder."

At a hearing before a subcommittee of the Senate Committee on Banking and Currency in February, 1926, Senator Carter Glass stated that the Federal Reserve Board (predecessors of appellees here) "has usurped the legislative functions of Congress." An amendment to restrict the power of the Board to impose conditions upon membership was being considered. Senator George Wharton Pepper, of Pennsylvania, who favored such an amendment, said in the Senate on February 23, 1925: "* * * the committee thinks that the discretion of the Federal Reserve Board in the premises should be a discretion exercised pursuant to the provisions and conditions of the act; that is, that there was no intent of Congress, when the Federal Reserve Act was passed, to create in the Federal Reserve Board a body to prescribe any kind of conditions it pleased as conditions precedent to admissibility to the Federal Reserve System, but rather to confer upon the Federal Reserve Board authority to make regulations pursuant to the Act fixing the terms upon which banks might become members of the Federal Reserve System."

The Board of Governors desired to retain the right to impose any conditions it chose upon membership and expressed its unqualified disapproval of the amendment proposed. Nevertheless, in 1927 the Congress amended the provision to read as follows: "The Board of Governors of the Federal Reserve System, subject to the provisions of this title and to such conditions as it may prescribe pursuant thereto, may permit the applying bank to become a stockholder of such Federal reserve bank."[7]

Moreover, the Board of Governors has expressly recognized that it has no statutory power to prevent the expansion of bank holding companies. An example of this recognition is found in the testimony of the appellee, Marriner S. Eccles, chairman of the Board of Governors, before the Committee on Banking and Currency of the House of Representatives on April 5, 1943. He said that he had given considerable thought to the operation and development of Transamerica and that he did not look upon it as a wholesome undertaking. He stated his opinion to be that Transamerica, in its purchase of the stock of banks and of the stock of corporations having nothing to do with banks, was pursuing an improper and unsound policy. He added, however, that the Board did not have, and had never sought from Congress, any power or authority to deal with that situation.

In his appearance before the same committee on May 10, 1943, Eccles was asked by Congressman Patman: "* * * unless you can get better cooperation out of Transamerica you would look with favor upon advocating legislation that would curb the bank holding companies?" He replied, "That would give the Board the power to require what they would consider a policy in the public interest." That answer constituted an admission of the Board's lack of power to curb holding companies, although its members considered that such curbing would be in the public interest.

Further recognition by the Board of its lack of the authority which it attempted to exercise by the imposition of Condition No. 4 appears in its annual report for the year 1943. After saying "there is now no effective control over the expansion of bank holding companies or in any other field in which they may choose to expand," the Board of Governors recommended to Congress "that immediate legislation be enacted preventing further expansion of existing

---

[6] 40 Stat. 233, Public Law 25, 65th Congress, approved June 21, 1917.

[7] 44 Stat. 1229, 12 U.S.C.A. § 321.

bank holding companies or the creation of new bank holding companies." That recommendation has not been followed and no such legislation has been enacted by the Congress.

So there is no statutory bar to the expansion of bank holding companies such as Transamerica. No Congressional enactment forbids Transamerica or any similar corporation to acquire and own any number of shares of the Peoples Bank or any member or non-member bank. Although the Board has requested Congress to authorize it to prevent the further growth of Transamerica and like organizations, Congress has withheld that authority. Its failure to enact the restrictive legislation strongly recommended by the Board of Governors shows a legislative intent that acquisition of bank shares by holding companies shall not be unlawful.

█ But nevertheless Condition No. 4 imposed by the Board of Governors in this case singles out one holding company and prohibits it from owning any shares of the member bank, however few in number. As has been shown, the avowed purpose was to prevent further expansion of Transamerica, in the face of the fact that the Board has expressly recognized its lack of power in that respect and has unsuccessfully sought to obtain such power from the Congress. Inevitably, it follows that if the Board's sole purpose here was to prevent the enlargement of Transamerica, the condition imposed was not expressive of, but contrary to, a plainly evident legislative intent. If that were its sole purpose, Condition No. 4 is invalid.

We find, however, that the Board members take the position that their purpose in imposing the condition was not only to check the extension of Transamerica, but also to protect the bank by preventing Transamerica from taking over its affairs. The appellees state in their brief, as we have heretofore shown, that "Condition No. 4 was therefore designed to prevent that corporation (Transamerica) from taking over appellant's affairs *after* it came into the System." The appellees' brief then adds, "Thus the Condition is directly related to 'management' and 'financial condition,' two of the subjects which the Board is specifically required to consider in passing upon membership applications. Under such circumstances the Condition has even that direct statutory sanction which appellant's argument would require." In this connection, it is noted from the record that on January 28, 1946, the Board of Governors adopted the following resolution: "Upon consideration of the latest report of examination of the Peoples Bank, Lakewood Village, California, from which the Board concluded that there had been no substantial change in the control, management or policy of the bank resulting from the acquisition by Transamerica Corporation of certain shares of the bank's stock, the Board, by unanimous vote, decided that there was no present need in the public interest for any action by the Board with respect to the condition of membership of the bank relating to acquisition of its stock by Transamerica Corporation."

The quoted resolution, in our view, administratively interprets Condition No. 4 as meaning that, if the Board should decide that a substantial change, against the public interest, has occurred in the bank's management, control or policy because of Transamerica's stock ownership, it must withdraw from ·the System after notice to do so. For obvious reasons, the Board could properly reach such a decision only after a full and fair hearing.

It is, of course, apparent that the resolution of January 28, 1946, adopted nearly two years after Transamerica acquired its shares and after the bank had during the same period unsuccessfully sought relief from the harsh condition, was primarily intended as an aid to the appellees' motion to dismiss the complaint. It was adopted soon after the suit was filed and was attached to the motion to dismiss. As indicative of the absence of a justiciable controversy, the resolution was not convincing to Mr. Justice Holtzoff, of the District Court, whose opinion[8] points out that the sword of Damocles is still suspended over the bank with the Board claiming the

---

[8] Peoples Bank v. Eccles, D.C., 64 F. Supp. 811.

right at any time to cut the thread. Indeed, the appellees state in their brief that action under the condition is "now justified by the facts."

In regarding the resolution as an administrative interpretation of the condition, we are supported by the appellees who state in their brief: "Condition No. 4, however, is not self-executing, as appears on its face. And the Board, in affixing the Condition in the light of the opinion which it then entertained as to the potential danger of Transamerica affiliation, did not by so acting declare in advance what its administrative decision might be if and when Transamerica should acquire some of appellant's shares. In affixing the Condition—by agreement with appellant—the Board intended to leave to future determination what action, if any, might be necessary pursuant thereto. Considerations of the public interest demanded that the Condition be imposed; the same considerations will determine when, if ever, the Condition need be enforced."

With the controversial Condition No. 4 thus properly evaluated by the Board itself, it is at once seen that the condition means no more, and gives the Board no greater authority, that standard Condition No. 1, which is that "subject bank at all times shall conduct its business and exercise its powers with due regard to the safety of its depositors, * * *" That is to say, if at any time a member bank shall appear to the Board of Governors to be pursuing unsound or unsafe bank policies, the Board may require it, after hearing, to withdraw from the System. Title 12 U.S.C.A. § 327, expressly provides that if a member bank has failed to comply with the provisions of certain sections of the Federal Reserve Act, or the regulations of the Board of Governors made pursuant thereto, or has ceased to exercise banking functions without a receiver or liquidating agent having been appointed, the Board shall have power, after hearing, to require the bank to surrender its stock in the Federal Reserve Bank and to forfeit all rights and privileges of membership.

If Condition No. 4 were given a literal interpretation, instead of the rational construction placed on it by the resolution of January 28, 1946, it would clothe the Board with arbitrary power to expel the bank without a hearing upon the happening of a contingency which had not adversely affected in any manner either the bank's position or the safety of its depositors. So construed, the condition is not authorized by the Act.

With respect to the meaning of Condition No. 4 and the method by which the Board could invoke it, the appellees, having made the concession heretofore quoted from their brief, make yet another which seems to us to be of extreme importance: "Even should appellant, if and when it receives such notice, take no action pursuant thereto, its membership could not be summarily forfeited. Section 9 of the Act (46 Stat. 250, 251, c. 207, U.S.C., Title 12, § 327 [12 U.S.C.A. § 327]) provides that, while the Board may order such a forfeiture, it can only do so 'after hearing' and a finding that appellant 'has failed to comply with the provisions of * * * [the law] or the regulations of the Board of Governors of the Federal Reserve System made pursuant thereto. * * *' Appellant's alleged danger is thus rendered even more remote."

Nothing in the condition itself requires the restrained interpretation of it contained in the appellees' language just quoted. The condition does not in so many words compel the construction placed upon it by the resolution of January 28, 1946, nor does it afford a hearing to the bank which the appellees now admit should be accorded. The appellant's alleged danger, which the appellees say "is thus rendered even more remote," was not remote as long as the unqualified denunciation of Transamerica was insisted upon by the appellees, and was regarded by them as a part of the bank's contractual obligations.

We have heretofore stated our conclusion to be that Condition No. 4, as a mere device to check the growth of a holding company, finds no foundation in the statute. We hold that it has validity only as a statement that, if the Board of Governors should determine, after hearing, that Transamerica's ownership of the bank's shares has resulted in a change for the

644

worse in the character of the bank's personnel, in its banking policies, in the safety of its deposits or in any other substantial way, it may require the bank to withdraw from the Federal Reserve System. Only in that sense can the condition be regarded as having been imposed pursuant to the Act. It is assumed that the Board would not resort to the drastic penalty of expulsion until it had exhausted the other disciplinary and corrective processes prescribed by the Federal Reserve Act.[9]

We turn now to the argument of the appellees that by accepting and enjoying membership with Condition No. 4 attached, the bank is estopped to question its validity or has waived invalidity or the right to assert it. Appellees' position is not sustained by the Supreme Court cases cited by them.[10] Those cases dealt with situations in which litigants were attacking the constitutionality of statutes or orders under which they had accepted privileges. Their remaining authority, White Star Bus Line v. People of Puerto Rico, 1 Cir., 75 F.2d 889, 892, was a case in which the bus company had accepted and operated under a franchise containing a proviso for annual payment of royalties to the island government. Later the bus line questioned the authority of the Public Service Commission to condition the franchise upon the payment of royalties. The Circuit Court of Appeals did not go so far as to hold that estoppel had arisen, but was content to say "It is doubtful whether the bus line is now in a position to raise this issue."

As justifying its doubt, the court cited United Fuel Gas Company v. Railroad Commission, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390 (also cited to us by the appellees) and Wall v. Parrot Silver and Copper Company, 244 U.S. 407, 37 S.Ct. 609, 61 L. Ed. 1229. In our view neither decision furnishes a basis for the doubt which the Circuit Court of Appeals expressed. In the Railroad Commission case [278 U.S. 300, 49 S.Ct. 152], the Supreme Court's holding on the point we now discuss was that those "who have procured action by a state commission under a state statute may not assail that action in a federal court of equity on the ground that that statute, or the one creating the commission, is void under the state constitution." In the Parrot case, [244 U.S. 407, 37 S.Ct. 611] the Supreme Court said that "The appellants, by their action in instituting a proceeding for the valuation of their stock, pursuant to those statutes, which is still pending, waived their right to assail the validity of them."

Obviously the principle announced in these two cases, which is the same rule found in the other Supreme Court decisions cited by the appellees, does not apply where the litigant charges that the administrative body has exceeded the authority conferred upon it by a statute, but does not attack the validity of the statute.

Whether estoppel has arisen, whether waiver has occurred, depends entirely upon whether Condition No. 4 is valid or invalid. No administrative body has authority to contract with a regulated corporation in a manner contrary to the statute which is being administered, nor in a way which does not give effect to the intent of Congress. The regulated corporation, by accepting such an invalid condition imposed by a regulatory authority, does not thereby waive the right to rely on the statute, and the right later to denounce the provision which contravenes it.

The remaining question is whether a justiciable controversy was shown. The appellees maintain that there was none, saying that an indispensable element of justiciability is a showing of either positive action or a threat to take such action by the responsible officials involved. We need not elaborate upon the opinion of the learned justice of the District Court [11] which re-

[9] Title 12 U.S.C.A. §§ 264(i)(1)(2), 301 and 77.

[10] Pierce Oil Corporation v. Phoenix Refining Co., 259 U.S. 125, 42 S.Ct. 440, 66 L.Ed. 855; United Fuel Gas Co. v. Railroad Commission, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390; St. Louis Malleable Casting Co. v. George C. Prendergast Construction Co., 260 U.S. 469, 43 S.Ct. 178, 67 L.Ed. 351; Hurley v. Commission of Fisheries, 257 U.S. 223, 42 S.Ct. 83, 66 L.Ed. 206.

[11] Justice Alexander Holtzoff in Peoples Bank v. Eccles, D.C., 64 F.Supp. 811.

jected that contention in denying the appellees' motion to dismiss the complaint. The resolution of January 28, 1946, disclaiming an immediate purpose to enforce Condition No. 4, protected the bank from literal enforcement of the condition only on that day; for the appellees argue in this court that enforcement is "now justified by the facts," although the resolution has not been rescinded, and a different one has not been adopted.

To those acquainted with the realities of banking, it is plain that public knowledge in the bank's service area of the existence of Condition No. 4 does incalculable harm to the bank. It is generally realized that nothing could more quickly cause depositors to lose confidence in a banking institution than withdrawal of federal deposit insurance. It is equally true that the confidence of depositors is undermined and weakened when they know that their insurance may be withdrawn on short notice, without a hearing, and for a cause having no relation whatever to the safety of their deposits. In such circumstances a positive threat by the Board to enforce the condition is not necessary to do the harm. The threat is implicit in the condition itself, and the harm is present and continuing, due to the mere existence of the condition.

But with the amelioration of the ill-chosen language of Condition No. 4, which the appellees now concede to be proper and which they claim is expressive of their original intention in adopting it, the mere presence of the condition will not continue to be harmful to the bank. With the provision construed to have the meaning which we have said is the only significance properly attributable to it, the bank's public will know that it is subject to expulsion from the System only for reasons which would justify expulsion of any member bank.

We hold, therefore, that a justiciable controversy was shown by the pleadings; that the District Court erred in reaching the conclusion that the bank "cannot now attack the validity of the condition to which it voluntarily agreed." As the District Court should have proceeded to interpret Condition No. 4, its decree will be set aside and the cause remanded for the entry of a judgment construing that proviso in a manner consistent with its true meaning as conceded by the appellees and as stated in this opinion. When that is done, there will be no ground for restraining the appellees from enforcing the condition, nor will the bank have any need for such injunctive relief.

Reversed and remanded.

EDGERTON, Associate Justice (dissenting.)

I think the Board had authority to impose the condition of which appellant now complains. However that may be, I think it clear that since the Board has not taken or threatened any action to enforce this condition there is no controversy over which the courts have jurisdiction. I do not reach the question of estoppel.