Oscar J. MARSHALL, Appellant,

v.

ISTHMIAN LINES, INC., Appellee.

No. 20414.

United States Court of Appeals
Fifth Circuit.

July 8, 1964.

Rehearing Denied Aug. 3, 1964.

See also 334 F.2d 521.

Arthur J. Mandell, Houston, Tex., for appellant.

John P. Forney, Jr., Houston, Tex., for appellee.

Before HUTCHESON and BROWN, Circuit Judges, and SIMPSON, District Judge.

JOHN R. BROWN, Circuit Judge.

The question presented by this appeal is whether it was error for a District Judge, despite timely requests and objections, to omit entirely from the charge in this maritime negligence action any mention of Coast Guard regulations whose significance both from a factual and a legal standpoint was hotly contested from the time the opening gong sounded until it ended with an adverse jury verdict some 15 rounds later. We hold it was and reverse for a new trial.

The Longshoreman Marshall was injured while stowing cotton in the hold of the SS STEEL SURVEYOR, owned and operated by the Shipowner, Isthmian Lines, Inc. At the time of the injury, the vessel was under time charter to States Marine Lines. But this did not shift any significant responsibilities off the Shipowner. Guzman v. Pichirilo, 1962, 369 U.S. 698, 82 S.Ct. 1095, 8 L. Ed.2d 205, 1962 A.M.C. 1142. Marshall's employer, a stevedoring contractor, had been engaged by States Marine to load cotton aboard the vessel. As one of a 15-man gang of longshoremen, he was working in a hold when the injury occurred.

The theory on which Marshall tried and submitted the case was that he was injured when a couple of defective steel bands binding the cotton bale he and another longshoreman were attempting to

stow broke. When the bands broke, his partner's cotton hook slipped causing the bale to roll back on him, pinning him down in a jackknife position and resulting in serious back injuries. These injuries were, on his theory, caused by the negligent failure of the vessel's owner, master, officers, and crew to inspect the cotton before it came aboard to determine whether it was in condition to be stowed with safety.[1]

The Shipowner maintained throughout that it was not negligent and that in any event, the accident did not happen as Marshall maintained. Under its theory, the bands were already broken when Marshall and his co-worker attempted to roll the bale, and Marshall just strained his back in so doing.[2]

 The transcript of testimony consumed some 800-odd pages. We need not comment on it except to say that there was evidence which tended to support each theory so that the jury had to choose between irreconcilable stories.

This brings us to the sole contention urged by Marshall in this Court. That contention is that certain Coast Guard regulations were directly relevant as they categorically prescribed that "Bales having damaged bindings shall not be accepted." Consequently he asserts that he was entitled to an instruction by the

Court as to the meaning and effect of the regulation, 46 C.F.R. §§ 146.27–25(a), (b) (1).[3] The relevance of the regulation to Marshall's defective bale theory is enhanced by the enabling statute authorizing the issuance of the regulations. 46 U.S.C.A. § 170. That statute—regulating the carriage of explosives or dangerous objects—makes it unlawful to knowingly transport, carry, convey, store, stow, or use aboard vessels to which the statute applies certain explosives or "other dangerous articles or substances * * * [and] hazardous articles * * *, except as permitted by the regulations of the Commandant of the Coast Guard established hereunder." [4] The regulations authorized by the statute classify cotton as a hazardous article. 46 C.F.R. § 146.27–100.[5]

So here is Marshall's theory. In his view, his injury was caused by a cotton bale having a defective binding. In order to recover against the Shipowner, he must show that the Shipowner was negligent in permitting the defective bale to be brought aboard for stowage. He then asserts that the "negligence" is established by the breach of the regulation. The regulations prohibiting acceptance of cotton bales having damaged bindings define cotton as a hazardous article. That definition is made binding

---

1. The Court refused to submit unseaworthiness because not raised by the evidence, and Marshall does not complain of this here.

2. The Shipowner also urged the partial defense of contributory negligence and asserted as a complete defense the doctrine of unavoidable accident. Cf. Page v. St. Louis Southwestern Railway Co., 5 Cir., 1963, 312 F.2d 84, 93.

3. The Regulation reads:
 "(a) *Scope.* Baled cotton may be transported on board vessels subject to R.S. 4472, as amended (46 U.S.C. 170), when the applicable requirements and conditions in this section are met.
 "(b) *Conditions of acceptance and stowage.* (1) All cotton shall be securely baled and bound and covered with bagging on at least three-fourths of its surface, including both ends of the bale. Poorly compressed bales shall not be ac-

cepted. Bales having damaged bindings shall not be accepted. Loose cotton shall be accepted for transportation on board any vessel."

4. 46 U.S.C.A. § 170(6) (a) reads:
 "It shall be unlawful *knowingly* to transport, carry, convey, store, stow, or use (except as fuel for its own machinery) on board any vessel, * * * any other explosives or other dangerous articles or substances, including inflammable liquids, inflammable solids, * * * [and] *hazardous articles,* * * * except as *permitted* by the regulations of the Commandant of the Coast Guard established hereunder." (Emphasis supplied.)

5. Under the columnar heading "Characteristic properties, cautions, markings required" the Table states:
 "the fiber of the cotton plant readily combustible."

on Shipowner,[6] and is re-enforced by the criminal provisions of the statute, 46 U.S.C.A. § 170(14), (15). All Marshall need do, he argues, is prove (1) that the bindings were damaged, and (2) that the damaged bindings contributed to his injury. Since, he reasons, the proof of acceptance of damaged bindings is proof of violation of the regulations, the Shipowner is guilty of negligence *per se,* and liability follows as night unto day. Implicit in all of this is the further contention that, whatever may be the ultimate determination of the *per se* problem, the regulation establishes a standard of care, and is at least evidence of negligence.

The Shipowner responds, first, that the regulation is not violated by acceptance of cotton with damaged bindings. It insists that 46 U.S.C.A. § 170 prohibits only *knowing* acceptance. Second, it strenuously argues that the regulations are designed to combat the danger of fire and therefore have no application to a personal injury situation like the one here.

■ The law is well established that violation of a statute which is intended to protect the class of persons to which a plaintiff belongs against the risk of the type of harm which has in fact occurred is negligence in itself. Prosser, Torts § 34, at 161 (2d ed. 1955); Restatement, Torts § 286 (1934). Inherent in this statement of the legal principle are three questions which must be resolved before liability could be imposed in this case on a negligence *per se* theory. What proof makes out a violation of the regu-

lations? Were the regulations designed to protect longshoremen? Were they intended to protect against the risk of the kind of harm that occurred here—injury from the hook-and-roll loading sequence? And, of course, consideration of all of those questions will illuminate the problem of the extent to which the regulations properly form any part of the jury charge.

■ First, contrary to the contention of the Shipowner and the basic holding of the Judge, it is clear to us that the regulations proscribe acceptance of bales with damaged bindings, whether "knowingly" or not. The regulations themselves flatly state, "Bales having damaged bindings shall not be accepted." It is true that there is no penalty or other sanction imposed in the regulations themselves, and that the penalty for noncompliance is contained in 46 U.S.C.A. § 170. It is likewise true that in the declaratory proscription of § 170(6) (a) and the punitive provisions, § 170(14), (15), the language clearly speaks in terms of "knowingly" transporting and "knowingly" violating. It is on the basis of this terminology that the Shipowner urges the general proposition that the power to promulgate regulations is derivative so that regulations may not exceed the limits of the authorizing statute,[7] here stated in terms of "knowingly."

■ But the inquiry does not end there. The whole statutory scheme is something much more than a set of prohibitions with punitive sanctions. It es-

---

6. 46 C.F.R. § 146.27–1 provides:
 "A hazardous article is defined for the purpose of the regulations in this subchapter as any article * * * which meets one or more of the following conditions:
 " * * * *
 " (c) Specifically named as hazardous in this subpart. "This definition is binding upon all shippers making shipments of hazardous articles by any vessel and shall apply to owners, charterers, agents, master or other person in charge of a vessel, and to other persons transporting, carrying, conveying, storing, stowing, or using hazardous articles on board vessels

subject to R.S. 4472, as amended, and the regulations in this subchapter."

7. Shipowner relies on Manhatten General Equip. Co. v. Commissioner, 1936, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528; Northern National Gas v. O'Malley, 8 Cir., 1960, 277 F.2d 128; Peoples Bank v. Eccles, 1947, 82 U.S.App.D.C. 126, 161 F.2d 636, reversed, 1948, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784, rehearing denied, 333 U.S. 877, 68 S.Ct. 900, 92 L.Ed. 1153; Hawke v. Commissioner, 9 Cir., 1940, 109 F.2d 946, cert. denied, 1940, 311 U.S. 657, 61 S.Ct. 11, 85 L.Ed. 421; Young v. Julian, D.Del., 1951, 97 F.Supp. 370.

tablishes a standard of care to which all concerned are bound, including those who do, and those who do not, wish to comply. This is made doubly sure by § 170(7) (b) [8] which declares in positive terms, not conditioned to "knowingly" that "* * * transportation * * stowage, or use of such * * * dangerous articles * * * shall be in accordance with the regulations" prescribed by the Coast Guard pursuant to § 170(7) (a). Thus the legislation followed the typical structure: (a) a declaration of standards, (b) legal sanctions to assure compliance.

■ Of course, quite different considerations come into play when the sanction takes the form of criminal penalties. Then, both as a matter of legislative policy, and often as a matter of constitutional limitations, criminal accountability requires some purposeful, knowing, that is, intentional, conduct, not an inadvertent careless act. Illustrating this best of all is the recent Fourth Cir-

cuit case [9] involving breach of a regulation promulgated under the Longshoremen's safety statute, 33 U.S.C.A. § 941 (a), and for which criminal penalties are confined to "willful" violations. § 941 (f). This did not prevent the breach of the regulations (and statute) from having decisive civil consequences as unseaworthiness or negligence. Whatever the two terms may mean in criminal prosecutions,[10] "knowingly" is certainly no stronger than "willful."

As did the Fourth Circuit, we hold that the regulation is mandatory to forbid the acceptance of the bales with damaged bindings.

■■ That brings us to the second and third steps. Undoubtedly the regulation was intended to protect longshoremen, or perhaps more broadly all persons who work on or come into relation to the vessel. But what is the risk? It seems fairly clear that as to this regulation, the principal risk is fire, explosion, and related harms.[11]

8. 46 U.S.C.A. § 170(7) provides:
 "(7) In order to secure effective provisions against the hazards of health, life, limb, or property created by * * * dangerous articles or substances * * *—
 "(a) [directs Coast Guard to promulgate regulations]
 "(b) The transportation, carriage, conveyance, storage, stowage, or use of such explosives or other dangerous articles or substances shall be in accordance with the regulations so established, which shall, insofar as applicable to them, respectively, be binding upon shippers and the owners, charterers, agents, masters, or persons in charge of such vessels, and upon all other persons transporting, carrying, conveying, storing, stowing, or using on board any such vessels any explosives or other dangerous articles or substances: *Provided*, That this section shall not be construed to prevent the transportation of military or naval forces with their accompanying munitions of war and stores."

9. Provenza v. American Export Lines, Inc., 4 Cir., 1963, 324 F.2d 660, 665.

10. These are baffling terms as all know who struggle with them. See Roe v. United States, 5 Cir., 1961, 287 F.2d 435, 442 nn. 11–14, 1963, 316 F.2d 617; Williamson v. United States, 5 Cir., 1964, 332 F.2d 123, n. 15.

11. Section 146.27–15, 46 C.F.R. § 146.27–15, proscribes stowing hazardous articles "in any compartment or hold in which explosives are stowed." Section 146.27–25 (b) (4) provides that "bales showing contact with oil or grease shall not be accepted." Section 146.27–25(5) provides that cotton shall not be stowed in a hold lately used for oil cargo unless "such hold has been steamed or otherwise cleaned so as to completely remove all traces of oil residue." It further provides that "holds which have been recently painted shall not be utilized for cotton stowage unless thoroughly dry." Section 146.27–25(6) is of particular significance. This section requires that upon completion of stowage, hatch covers must be completely closed. Further, where required, tarpaulins are to be fitted and secured in place to secure a tight hold. It forbids missing hatch covers. It directs that when the hatch cover is left off during temporary stoppage of loading, the master must provide a fire watch and station it in the hold in which the cotton is stowed. Section 146.27–25(7) requires spark screens on ventilator cowls feeding into holds containing cotton to prevent ingress of sparks. The regulations continue in this fashion, covering such things as hold fire extinguishers, § 146.27–25(c) (1), spark arrestors, § 146.27–25(c) (2), elimination

■ As the very bulk of the Coast Guard regulations reflects, literally thousands of commodities are classified with minute special instructions as to labeling, marking, packaging, storing, and the like. It is perfectly obvious, therefore, that we cannot, we do not, undertake to categorize any of the regulations other than this one on cotton bales (46 C.F.R. § 146.27–25(b)) as *per se* or non-*per se*.[12] Many commodities, such as acids, poisons, toxic liquids, inflammables, chemicals, and the like pose such dangers to man that regulations designed to avoid such risks, e. g., 46 C.F.R. §§ 146.20–1–300, 146.21–1–100, 146.22–1–100, 146.23–1–100, 146.25–1–400, 146.26–1–100, may well give rise to *per se* consequences, cf. Green v. Standard Wholesale Phosphate & Acid Works, D.Md., 1928, 29 F.2d 746; Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427. But all we hold here is that this regulation was not designed to protect against the risk of the harm incurred.

■ But this determination that negligence *per se* does not here apply does not mean that the regulations have no relevance at all in a negligence action. As Prosser says,

"[T]he existence of a statute does not prevent an action for common law negligence; and where the statute does set standard precautions, although only for the protection of others, or the prevention of a distinct risk, it would seem that it may

be a relevant fact, having some bearing on the conduct of a reasonable man under the circumstances, which the jury should be permitted to consider." Prosser, Torts § 34, at 162 (2d ed. 1955).

This, we think, is the proper application of the regulations involved in this case. It is a question for the jury whether a Shipowner, charged with knowledge that the law forbids the acceptance of bales with defective bindings, would, in the exercise of reasonable prudence under like circumstances, nevertheless have accepted for stowage such bales.

■ This conclusion compels the further one that the trial Court erred in not giving suitable instructions to the jury. From the outset, the Judge was persuaded that the Shipowner was correct that breach of the Coast Guard regulations required that it be done "knowingly." In this, of course, we now hold the Judge to have been in error. But it did not stop there. In the request for charge, in the commendable pre-charge conference held in chambers, and in the exceptions and counter-exceptions of respective counsel, the Judge's responses revealed a fixed determination that no instruction of any kind as to the Coast Guard regulations would be given. For example, when the Judge advised counsel for Marshall that both counsel could freely argue the effect of the Coast Guard regulations to the jury even though no instructions would be given, counsel for the Shipowner unsuccessfully implored

of sources of sparks and naked lights, § 146.27–25(c), availability of fire hose, fire pumps, and fire extinguishers for instant use during loading, § 146.27–25(4), prohibition of smoking during loading except at certain designated places and the posting of "no smoking signs," § 146.27–25 (5), and the sweeping of the holds "broom clean." § 146.27–25(6). The mixed cargo regulations, § 146.27–25(d), (e), also reflect this fire prevention purpose.

12. Nor do we decide whether in some future case a flagrant breach of such regulations, resulting more directly in the particular injury at suit might result in

imposition of liability on a theory akin to that utilized in Kernan v. American Dredging Co., 1958, 355 U.S. 426, 78 S. Ct. 394, 2 L.Ed.2d 382, 1958 A.M.C. 251. It should also be apparent that our conclusion is not inconsistent with the holding of the Court in Provenza v. American Export Lines, Inc., 4 Cir., 1963, 324 F. 2d 660. The regulation there involved, 29 C.F.R. § 9.43(b), was promulgated as part of the Safety and Health Regulations for Longshoring pursuant to 33 U.S.C.A. § 941(a), and the injury at suit in that case was clearly within the risk of harm intended to be prevented by the regulation.

the Judge to give a negative instruction against consideration of the regulations unless the jury first found a *knowing* violation. With complete impartiality, the Judge declined this as well.

In other words, in the face of insistence by Marshall's counsel that the Coast Guard regulations were pertinent, established a standard of care and had a specific legal consequence, the Court declined to give any charge whatsoever. This brief preface may end with the statement that the stenographic report of the jury argument by Marshall's counsel indicates he took his full accustomed advantage of the opportunity to declaim on the regulations and we may assume that his skilled adversary, not to be outdone, must have responded in kind.

Although Marshall's specific request went too far in charging a breach to be negligence *per se*, the Court's refusal to charge at all on the regulations did not stem from this. The Judge was fully cognizant of the whole problem, and the respective contentions of each. The Judge knew that in the eyes of all counsel the regulations were now crucial. As it is clear that imperfections in the formal request did not in any way precipitate the Judge's comprehensive refusal of any charge whatsoever, we hold the matter was adequately preserved.[13]

 In this setting, what was the Judge's function? In a Federal District Court, where the Judge is no mere moderator receiving formal instruction-requests to be passed, conduit-like, to the jury, the Judge is the master of the proceeding. It is to be the Court's charge, not an aggregation of requests from the parties. The Judge has an obligation to charge on the essential elements of the case and instruct the jury as to the law on matters which developments of the trial have made significant and important. This obligation is no less pervasive or exacting because, in numerous instances procedural rules require specific objection as a ground for reversal. That element, of course, is not in this case for reasons we have discussed. Professor Wright sounds this tone of obligation, well:

> "It is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the applicable law of the case, and to guide, direct and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth."

2B Barron & Holtzoff, Federal Practice and Procedure § 1105, at 470 (Wright ed. 1961).

As the case approached the Moment of Truth for jury resolution, the Coast Guard regulations more and more were the center of controversy. The injured longshoreman had one notion of what they meant. The Shipowner another, and presumably the Judge still another. The Judge took enough of a position to hold that the regulations were relevant, i. e., could be discussed on jury argument. But what did they mean? Did they establish a standard of compliance? A standard of care? If so, what kind of standard? What was the effect of noncompliance? How was the jury to translate its resolution into definitive decision —for the plaintiff or for the defendant, etc.?

 These were all questions of law. They were matters on which the Judge alone could speak authoritatively. They were matters on which, in thus speaking, he might mistakenly declare

---

13. We certainly concur in this statement of the controlling principle:

> "If the request directs the court's attention to a point upon which the jury has not been charged but upon which an instruction would be helpful, the court's error in failing to charge may not be excused by technical defects in a request to charge."

2B Barron & Holtzoff § 1102, at 448 (Wright ed. 1961); F.R.Civ.P. 51; see also Southern Ry. Co. v. Elliott, 6 Cir., 1958, 250 F.2d 740; Messer v. L. B. Foster Co., 5 Cir., 1958, 254 F.2d 412; Wright v. Farm Journal, 2 Cir., 1947, 158 F.2d 976; Williams v. Powers, 6 Cir., 1943, 135 F.2d 153.

**138**

the law, but his duty nevertheless was to state it. This was not something to be left to counsel. And more important, the jury ought not to have been put in the predicament either of taking their deliverance on the law from counsel or passing judgment upon the legal competence of counsel as oracles of the law.[14] Under these conditions, it was not enough to leave the whole thing within the vague contours of a general charge with the inescapable boilerplate instructions on negligence and the like.[15] While the matter may now be in sharper focus since we have made determinations of the meaning and effect of the regulations, it is plain that the Judge was obligated to advise the jury as to their meaning, application, significance and effect. This would include, as a minimum, a positive declaration that the regulations do prescribe a standard of care, and, since this is not a *per se* situation, the jury could take the standard of care into account in determining whether this Shipowner in these circumstances was guilty of negligence.

The trial began, the trial ended in a dispute over the Coast Guard regulations. We hold that when the jury undertakes to resolve it, they are entitled to be told what the dispute is all about.

Reversed and remanded.

HUTCHESON, Circuit Judge (concurring specially).

I concur in the opinion of the majority that the district judge was right in holding as to the Coast Guard regulations that the evidence did not make out a case

of liability as a matter of law, but that the district judge erred, despite timely requests and objections, in omitting entirely from the charge any mention of the Coast Guard regulations. I, therefore, concur in the result, that because of this omission the judgment must be reversed and the cause remanded for a new trial and for further proceedings not inconsistent therewith.

---

14. Actually, it was more serious than this. The Judge, without a doubt, was convinced that under the law there could be no violation unless "knowingly" done. Yet he did not declare that to be the law. The jury had not only to choose between counsel, it had to speculate what the Judge thought on a matter on which he had obviously thought.

15. We and other Courts have held that the duty is to give instructions which are meaningful and translated—not in terms of some abstract case—but into the facts

of this particular case. E.g., Jackson v. King, 5 Cir., 1955, 223 F.2d 714, 718; Edward E. Morgan Co. v. United States, 5 Cir., 1956, 230 F.2d 896, 901; Merchant's Fast Motor Lines, Inc. v. Lane, 5 Cir., 1958, 259 F.2d 336, 338, 341; Kirby Lumber Corp. v. White, 5 Cir., 1961, 288 F.2d 566, 571; Stevens v. United States, 5 Cir., 1962, 302 F.2d 158, 165; Halprin v. Mora, 3 Cir., 1956, 231 F.2d 197, 203; McDonnell v. Timmerman, 8 Cir., 1959, 269 F.2d 54, 58; Great American Ins. Co. v. Horab, 8 Cir., 1962, 309 F.2d 262, 266.