Herbert D. HOVER, d/b/a Ciro's,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 20853-WM.

United States District Court
S. D. California,
Central Division.

Jan. 3, 1958.

Ernest R. Mortenson, Pasadena, Cal., for plaintiff.

Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Chief, Tax Div., Los Angeles, Cal., for defendant.

IRVING R. KAUFMAN, District Judge.

This suit was originally brought by plaintiff, proprietor of Ciro's, a nightclub, for refund of $300 paid pursuant to a deficiency of $67,660.62 in cabaret taxes assessed against him for the period between June 1, 1951 and March 31, 1955. Defendant has counterclaimed for $75,219.13, the unpaid balance of said assessment and interest.[1]

1. Of the original assessment of $67,660.62, $992 by stipulation is conceded to be owing and not in issue in this suit.

Ciro's, located on Sunset Boulevard in Los Angeles, is sub-divided into three rooms in which the services and facilities of the Club are offered to the public. In addition to the main entertainment and dining room, hereinafter referred to as the "Main Room", there are the "Pavillion" and "Ciroette" rooms. A lounge or cocktail bar located adjacent to the Main Room also serviced Ciro's patrons but its operations are not involved in this suit. In issue in this proceeding are the taxability of receipts from (1) the Pavillion Room, (2) the Ciroette Room and (3) the "closed house parties"—when the entire club was closed to the public and reserved for the exclusive use of private organizations. In the interest of simplicity and organization, I shall discuss separately these three operations forming the basis of the tax.

### Pavillion Room

The Pavillion Room is located adjacent to the lounge (which is basically a raised extension of the Main Room) and is separated therefrom by a movable wall and thick, soundproof curtain. It is undisputed that this room was used primarily to accommodate private organizations which desired to reserve for the evening such a room for the exclusive use of its members. The charges incurred or expended by these organizations or its members availing themselves of the facilities of the Pavillion Room form the basis of the cabaret tax assessment here in dispute. It is the Government's contention that the opportunity to witness the floor show in the Main Room was a strong inducement to these organizations to make their arrangements with Ciro's and that indeed, at the appropriate time the movable partition separating the Main Room and the Pavillion Room was opened so as to permit the Pavillion Room guests to view the floor show in the Main Room. It follows, the Government argues, that such guests were entitled to be present during the furnishing of a public performance for profit within the meaning of Int.Rev. Code of 1954, Section 4231(6),[2] and that the receipts obtained in the Pavillion Room both before and after the separation was removed are subject to the cabaret tax. More specifically, the Government is here seeking to sustain a cabaret tax on 94% of the receipts attributed to 304 private parties conducted in the Pavillion Room. The 6% of the receipts excluded from the tax represent expenditures by patrons who are presumed to have left prior to seeing the show.[3] While there is some variation in the way these 304 parties were conducted, for the most part private organizations would contact Ciro's for the

---

[2] Section 4231(6) imposes "a tax equivalent to 20 percent of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The tax imposed under this paragraph shall be returned and paid by the person receiving such payments * * *." 26 U.S.C.A. § 4231(6).

The term roof garden, cabaret or other similar places is defined by Int.Rev.Code of 1954, Section 4232 to "include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise * * *." 26 U.S.C.A. § 4232.

Though the operative sections of the Code have been changed during the five year period for which the tax is assessed, I have referred only to the sections of the 1954 Code since they substantially embody the provisions which are applicable to each period included in the assessment.

[3] Such charges are exempt from the tax under U.S.Treas.Reg. 43, Section 101.13 (b) (1941) which exempts from the tax charges incurred by patrons who do not remain for any part of the performance.

The use of the 94% figure in computing the tax is admittedly an estimate but in view of plaintiff's failure to keep records as provided by law the Government takes the position that it can reasonably carry over and apply the same percentage of those receipts which are non-taxable in the Main Room to the Pavillion Room operation.

purpose of arranging for the use of the Pavillion Room on a particular night for the exclusive use of its members. A contract would be negotiated and a deposit secured. Generally dinner would be served commencing some time around 7:00 P.M. and terminating before 10:30 P.M. During this period the movable partition separating the Main Room from the Pavillion Room would remain closed and the parties had the complete and uninterrupted privacy of the Pavillion Room to do as they pleased. Depending on the nature of the organization, speeches, awards, community singing, local entertainment or dancing to music either piped in from the Main Room or furnished by their own hired orchestra might follow the dinner. In any event at approximately 10:30 P.M. the separation was usually removed so as to enable the groups to view the floor show in the Main Room. There seems to be no question but that the patrons attending the dinner in the Pavillion Room expected to be able to see the entertainment in the Main Room, it being the understanding, whether committed to writing or not, that the so-called private parties would be afforded this privilege. Upon conclusion of the floor show, the evidence indicates that most of the guests at the private parties left the premises.

 It is under these circumstances that I am called upon to construe the meaning of Section 4231(6) which imposes a tax on amounts paid for refreshment or service at a cabaret:

" * * * furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance * * * "

The statute is not free from ambiguity and must be construed so as not to produce illogical or irrational results. A literal translation of the above provision would ascribe to Congressional intent a most arbitrary and unreasonable basis on which the tax is imposed. Such a literal reading of the statute would subject an establishment which operates as a cabaret in the evening to a tax on its late afternoon receipts since it is conceivable that these afternoon patrons might presumably be entitled to view a portion of the evening entertainment if they were to remain on the premises until show time. To condition a tax on such a tenuous showing that the patrons might if they were to wait long enough view the entertainment does not accord with any meaningful or purposeful distinction that we must impute to Congress. As noted by the Supreme Court, "taxation is an intensely practical matter, and laws in respect of it should be construed and applied with a view of avoiding, so far as possible, unjust and oppressive consequences." Farmers Loan & Trust Co. v. State of Minnesota, 1930, 280 U.S. 204, 212, 50 S.Ct. 98, 100, 74 L.Ed. 371. See also Paxson v. Commissioner, 3 Cir., 1944, 144 F.2d 772, 776. In connection with the present statute the Internal Revenue Bureau itself, through the issuance of interpretive regulations and rulings, has impliedly recognized the necessity, or at least the desirability, of limiting the broad language of the statute.[4]

The Internal Revenue Bureau has taken the position however, that payments for food, refreshment, service or merchandise made prior to the beginning of the entertainment in a cabaret, roof garden or other similar place by patrons who are entitled to view a public performance are subject to the cabaret tax where the patrons by or for whom such amounts are paid do in fact remain for any portion of the performance. Rev. Rul. 54–487, 1954–2 Cum.Bull. 376. Though limiting somewhat the broad scope and effect which flows from a literal reading of the statute,[5] the revenue ruling nevertheless poses an unrealistic criterion which may in some situations

4. See U.S.Treas.Reg. 43, Section 101.13 (b) (1941) supra, note 3.

5. This ruling like the Treasury Regulation cited in note 3 supra precludes taxation of charges incurred by patrons who do not remain for the public performance.

lead to results which under no stretch of the imagination could be considered as within the contemplation of Congress in enacting Section 4231(6).

The opinion in La Jolla Casa de Manana v. Riddell, D.C.S.D.Cal.1952, 106 F. Supp. 132, affirmed, 9 Cir., 1953, 206 F. 2d 925, is particularly significant inasmuch as it presumably expresses the Ninth Circuit's thinking on the subject. Judge Byrne, by noting that Congress in imposing a cabaret tax, "envisioned an essential unity between the service of refreshment and the enjoyment of the entertainment", adopted an interpretation inconsistent with that placed on the statute by the Revenue Department. (106 F. Supp. at page 135). Involved in the Casa de Manana case was the imposition of the cabaret tax from midnight until 2 A.M. after the entertainment had ceased. Though some of the patrons to whom refreshments were sold during these hours had been present during part of the entertainment prior to midnight, the Court refused to allow a cabaret tax assessment on any of the receipts from midnight to 2:00 A.M. A contrary decision, as noted by Judge Byrne, would place a construction on the statute which would exempt post midnight purchases by patrons who were present at the entertainment from 9:15 P.M. until 9:30 P.M. and returned at 12:30 A.M., while taxing such purchases by patrons remaining at the cabaret past twelve o'clock P.M. The illogic of such a construction is demonstrated by the fact that the applicability of the tax on post midnight purchases would be made dependent on whether or not a patron would take a walk at midnight. Though the Casa de Manana case concerned itself with the taxability of receipts subsequent to a public performance its underlying rationale is equally applicable to receipts obtained prior to the commencement of such a performance. Using the same reasoning as was employed by Judge Byrne the taxation of all payments made for refreshments and service by patrons who were present both prior to and during the public performance, where the applicability of the tax to the pre-performance receipts would be otherwise had there been an interval in their attendance, is without reason and logic.

I do not mean to suggest that the Treasury Regulations taxing such receipts should be denied any meaning and effect. Certainly, to allow pre-performance receipts in each and every case to escape the imposition of a tax would serve to provide a facile means for tax avoidance, would compound the already existing difficulties present in tax collection and administration, and would be as much productive of inequities and as lacking in logic as would be the adoption of the other extreme—holding all pre-performance payments by persons remaining for the public performance within in the pale of this statute. The only sensible and practical approach to the problem is to consider the wording of the statute in the light of each factual situation as it is presented keeping always in mind the objectives and purposes the statute sought to achieve. As I construe the statute, whatever be its true scope, it was never intended to cover those pre-performance payments by patrons whose desire to be present at the public performance was incidental to some other more cogent reason for attending the cabaret, such as a gathering of a private club or organization for the conduct of its business. Any other construction would lead to some of the strikingly incongruous results suggested by counsel.

In the instant case the chief factor militating against inclusion of the pre-performance receipts in the tax assessment is that the patrons by or for whom the charges were incurred were seemingly members of a private party, a factor which is relevant in showing that their chief motivation for engaging Ciro's was for the purpose of enjoying the intimacy of their own private gathering rather than for purposes of seeing the floor show. In this regard the Government has referred me to U. S. Treas. Reg. 43, Section 101.14(b) (1941) made applicable to 1954 Code by T.D. 6091,

1954–2 Cum.Bull. 47, which provides that amounts paid for refreshment, service, or merchandise in a room which is entirely separate from the room in which entertainment is furnished, are not subject to tax provided the patrons in such a separate room may not witness the entertainment and any door in the wall or partition separating the two rooms remains closed during the period of entertainment except when persons pass from one room to another. For similar judicial constructions of the statute see In re Duffin, D.C.S.D.Cal.1956, 141 F.Supp. 869; McKenzie v. Maloney, D.C.D.Ore. 1946, 71 F.Supp. 691. The Government argues that since the partition was removed at 10:30 P.M. and the Pavillion Room patrons were able to view the entertainment the case does not fall within the exception set out by the regulations and the tax assessment here in issue was entirely proper.

The error of the Government's reasoning lies in its failure to distinguish two separate concepts. The taxing statute requires that there be both (1) a public performance and (2) the patrons be entitled to view any portion of such a performance, as a condition for the imposition of the cabaret tax. The regulation above upon which the Government places such strong reliance goes solely to the question of whether there is a public performance. As a related issue, though nevertheless separate and distinct, is the question of whether or not the patrons of the Pavillion Room were entitled to be present during any of this performance. As noted earlier, "entitled to be present" cannot be construed literally and must be read in the light of the circumstances of each individual case. Even assuming arguendo that in view of the removal of the partition at or about 10:30 P.M. there was a public performance in regard to the Pavillion Room guests it is not determinative of whether such guests were entitled to be present under the meaning which I have ascribed to such words. The fact that the Pavillion Room parties may have been public when viewed in their entirety is im-material insofar as it pertains to the pre-performance receipts if it be shown that the main purpose of private groups in engaging the Pavillion Room was other than to be present at the entertainment. To conclude as does the Government that a showing that plaintiff has failed to place himself within the exception of Section 101.14(b) of Regulation 43 is dispositive of the entire issue raised by the tax on the Pavillion Room receipts is susceptible to the same objections raised by Judge Byrne in the Casa de Manana case. Under such a criterion, a day-long convention if held in the Pavillion Room would have its entire payments for services and refreshments subjected to the tax if at 10:30 P.M. the separation was removed for the conventioneers to view for an hour or so the entertainment in common with the public patrons enjoying the facilities of the Main Room; or, perhaps to better illustrate the unsoundness of this position, the Government seeks to sustain the tax imposed, though under the applicable regulations it must concede that if the Pavillion Room parties had been truly private prior to 10:30 P.M. and had the guests thereupon disbanded only to return individually to the Main Room, undistinguished from the other patrons to view the floor show, the charges incurred in the Pavillion Room would not be taxable.

It follows that in the instant case a determination of whether the parties when viewed in their entirety are public or private cannot be conclusive of the ultimate issue presented. Rather, the applicability of the tax is to be tested by the motivation formulation which I have previously described. In order to determine how significant a factor the privilege of viewing the floor show played in the decision of the 304 organizations to reserve the Pavillion Room, evidence of the operations and physical facilities of both rooms are relevant. Certainly, if the operations and physical layouts of both rooms were such as to give the impression of oneness, the inference is justified that the organiza-

tions using the Pavillion Room desired to simulate as much as possible the conditions in the Main Room, considered themselves part and parcel of the general Ciro's operation, and not so much for reasons of privacy but for purposes of capturing Ciro's atmosphere, floor show and all, engaged the facilities of the Pavillion Room.

There seems to be no real dispute that the 304 parties in dispute were private up to 10:30 P.M. The Government concedes that if the parties had ended before the commencement of the floor show or if the partition had remained closed and the Pavillion Room patrons excluded from entering the Main Room or observing the activity therein the expenditures before 10:30 P.M. would not lie within the scope of the tax. This would be true, even if the groups using the Pavillion Room had arranged for their own entertainment since under the statute there would be no public performance.

The crucial determination then, as I see it, is whether the operation of these so-called private parties is so intimately related to the general operation of the Main Room, and the viewing by the Pavillion Room guests of the entertainment at 10:30 P.M. such an integral part of their evening's activities, that it can be reasonably inferred that the compelling motive in reserving the use of the Pavillion Room was for purposes of seeing Ciro's entertainment. On this question much evidence was received at the trial. In addition, in order better to understand and appraise the physical relationship between the two rooms, as I have indicated, the Court itself inspected the premises with all counsel present. On the basis of this personal observation it is my opinion that the floor plan and structural layout of the two rooms compels the finding that two separate and distinct rooms were contemplated by the owner and that it was intended that Ciro's would acquire the private party business by offering the privacy necessary to these organizations in the execution of their customary meetings or gatherings while affording them

the opportunity of functioning in a well-known establishment like Ciro's.

The two rooms are separated by a lounge with separate seating and dining facilities. The lounge is slightly elevated and the Pavillion Room is further raised, thereby creating a six step elevation differential between the Pavillion Room and the Main Room. Because of this added height the patrons sitting in the Pavillion Room can view the entertainment in the Main Room when the separation wall and curtain are withdrawn by looking through the adjacent lounge. However, since the stage is located at the other end of the Main Room, obtaining a good perspective of the floor show from the Pavillion Room is difficult in view of the distance involved, and those in the rear of the Pavillion Room must move their seats into the fore part of that room in order to view the show. Though ingress and egress to both rooms is possible by way of the lounge, the Pavillion Room has in addition its own separate entrance. Rest rooms are shared in common with the Main Room, though entrance can be made from the Pavillion Room itself. Each room has its separate dance floor and band stand. Tables and chairs used in the respective rooms seem to be of a different character and their arrangement dissimilar. The building plans further disclose that the two rooms were not constructed as one unit but that the Pavillion Room was added long after the Main Room had been in existence. I might further add that upon the closing of the partition separating the two rooms there is an atmosphere of complete privacy and it is reasonable to assume that it was this privacy together with the facilities available at Ciro's which the organizations found so attractive.

A comparison of the respective operations of both rooms further discloses an intent on the part of the management to treat the rooms other than as a single unit. The plaintiff has testified as to some 25 basic differences in the operations of the two rooms. To mention but a few such distinctions—there were dif-

ferences in menus, prices, services, working hours and duties of the waiters, manner of payment, parking fees, cover charges, etc. Under such circumstances I find that the private groups availing themselves of the facilities of the Pavillion Room did not consider themselves as part of the public patronage at Ciro's and that any intent on their part of being assimilated into the general overall cabaret atmosphere of Ciro's was of incidental significance in their decision to conduct their parties in the Pavillion Room.[6] Their conscious choice to reserve the Pavillion Room which was located at considerable distance from the main sphere of activity indicates to me that the prime moving consideration in selecting the Pavillion Room was the desire to achieve some sense of privacy for their group activity and business—at least until the entertainment began. In view of this conclusion the receipts prior to the removal of the separation in the Pavillion Room and the commencement of the floor show are outside the scope of the cabaret tax and were improperly included within the assessment.

Plaintiff next contends that if the parties be found to be private prior to 10:30 P.M. such a characterization should not be destroyed upon the removal of the partition, and that all receipts whether obtained prior to or subsequent to the entertainment should be excluded from the tax. Since the evidence is undisputed that upon the removal of the partition the Pavillion Room guests did observe and participate in the public performance in common with the other patrons in the Main Room I fail to see why any distinction between the two rooms is warranted during this period. I might analogize the position of the Pavillion Room guests to the patrons of the lounge during the show or to the late-comers to the Main Room, who because of the crowded conditions existent there, are forced to stand at the bar in the lounge in order to see the floor show. Any payments for drinks or refreshments made by these patrons would, of course, be subject to the tax.

The parties have stipulated that with respect to the $55,581.98 assessed against the Pavillion Room receipts, $5,200.63 would represent the tax on payments made subsequent to 10:30 P.M. I find therefore that $5,200.63 represents the correct tax assessment on the Pavillion Room operation.

### Ciroette Room

The Ciroette Room like the Pavillion Room was used primarily to accommodate private gatherings. However, unlike the Pavillion Room, it was located on the second floor of the building and those patrons desiring to see the floor show could do so only by descending a flight of stairs and passing through two doorways to the Main Room. Contending that plaintiff held out to the prospective organizations desiring to use the Ciroette Room the promise of seeing the entertainment at 10:30 P.M. and that some 5% of the Ciroette patrons did in fact avail themselves of this opportunity the Government assessed a cabaret tax based on 5% of the receipts taken in by the Ciroette Room. Plaintiff concedes that if any tax is due it is to be computed on the basis of 5% of these receipts and the only question presented for my consideration is whether as a matter of law the cabaret tax applies to this 5%.

The nature of these private parties being similar to those conducted in the Pavillion Room my prior discussion on this subject is pertinent here and does not have to be repeated. However, the reasons for denying the tax on pre-performance receipts in the Pavillion Room are

6. I am not unmindful that one of the inducements for arranging such gatherings at Ciro's was the opportunity to view the floor show. But it seems reasonable to me that if such were the principal factor in selecting Ciro's the private groups would have done infinitely better to reserve so many tables in the main entertainment room to accommodate their party. As such they would not only have a much better vantage point from which to see the show but they would be able to use the large dance floor located in the Main Room with less inconvenience.

even more potent here in view of the obvious remoteness of the Ciroette Room and the substantial effort and distance to be traversed for its patrons to observe the floor show. I find therefore, that the tax assessment on the 5% of the Ciroette Room's receipts is improper.

### Closed House Parties

Part of the initial deficiency assessment consists of a 20% tax on all amounts paid for admission, refreshment, service or merchandise on twenty evenings when all the facilities of Ciro's were reserved by and for the members of one particular organization. The Government seeks to sustain the imposition of the tax on the basis of a recent ruling which reads as follows:

"Where a private organization arranges to hold an affair in a room at a hotel which normally is operated as a cabaret and the affair is held under such circumstances that the hotel furnishes practically the same services, including entertainment, during the same hours that the room is operated as a cabaret, the arrangements made by the private organization are regarded as a mere reservation of tables. In such case, the Bureau holds that the room is operated as a cabaret on such occasions, even though the patronage is limited to the members, together with the guests of the private organization, and the private organization furnishes entertainment in addition to that furnished by the hotel * * *.

"Where a private organization holds a dinner in a room at a hotel, under such circumstances that the hotel does not furnish any entertainment but the private organization does provide dancing facilities for the persons attending by hiring an orchestra, or furnishes other entertainment, cabaret tax does not apply to any amount paid in connection with the affair." Special Ruling, August 31, 1949, 5 CCH 1950 Stand. Fed.Tax Rep. Para. 6053.

Under this ruling the issue to be resolved is whether the same services and entertainment were provided or whether the private organizations themselves contracted for the entertainment. The ruling by the Commissioner has never been passed on by a Court and plaintiff contends that it is contrary to those cases which determine the applicability of the tax on the basis of whether the parties are public or private. See United States v. Lambeth, 9 Cir., 1949, 176 F.2d 810; Naylor v. United States, D.C.S.D.Cal. 1952, 102 F.Supp. 309. Under plaintiff's interpretation of the law the taxability of the receipts in question hinges on a determination of whether the public was in fact excluded from these parties.

The respective litigants are therefore in hopeless conflict on the applicable criteria to be applied. However, I need not resolve this conflict in order to dispose of the immediate issue before me. Even assuming the correctness of the Government's position, it cannot prevail since the evidence conclusively establishes that the private organizations themselves contracted for the entertainment and music. I attach little significance to the fact that the show usually provided was the same as that regularly staged by Ciro's and that Ciro's advised the private organizations as to the amount and distribution of the payments to be made to the performers if the private organizations should hire them. It appears, that at best, Ciro's was acting as an intermediary for the convenience of the private groups. The evidence is unmistakably clear that in all cases payments were made directly by the private groups to the performers and private groups could if they so desired rent the Main Room without the Ciro entertainment and could furnish instead their own entertainment and orchestra. Indeed when the Ciro entertainers were retained by the private groups they were able to exercise control over the time when the performers would commence, the type of performance, etc. indicating it was a closed private group performance. As such, any service rendered by Ciro's

was purely advisory and for the convenience of the private group and does not justify a finding that Ciro's furnished the entertainment on these twenty evenings in issue. The private organizations remained free to reject the regular entertainment appearing at Ciro's and if they chose to engage such performers could modify their acts to suit their own purposes.

The Government's contention that on six of the twenty nights in question the public was admitted and as to at least these six occasions all the receipts should be taxable equally, is without merit. It appears that the public was admitted only after the private groups had concluded their parties and surrendered the premises. The subsequent reversion of the Club to a cabaret status can certainly have no bearing on the nature or the character of the parties in which the public was rigidly excluded.

I find that the assessment on the twenty closed house parties is improper. Submit judgment consistent with this opinion.