M. S. STEVENS and wife, Margurette
Stevens, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 18877.

United States Court of Appeals
Fifth Circuit.

April 25, 1962.

James A. Stockard, Edward B. Winn, Lane, Savage, Counts & Winn, Dallas, Tex., for appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., Michael I. Smith, Lee A. Jackson, Thomas H. McPeters, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., W. E. Smith, Asst. U. S. Atty., Dallas, Tex., W. B. West, III, U. S. Atty., Fort Worth, Tex., for appellee.

Before BROWN, WISDOM and BELL, Circuit Judges.

WISDOM, Circuit Judge.

"The Round-Up" in Dallas, Texas, features a hill-billy band and advertises that it has "the largest dance floor in the southwest". The appellants, owners of The Round-Up, bring this refund action to recover the federal cabaret tax [1] assessed against them. Their right to a refund depends on whether The Round-Up comes within a clause exempting "a ballroom, dance hall, or other similar place where the serving or selling of

---

1. The taxpayers have paid and do not dispute the tax imposed by Section 1700(a) of the 1939 Code 26 U.S.C.A. § 1700(a) and Section 4231(1) of the 1954 Code 26 U.S.C.A. § 4231(1) on their receipts from admission charges.

food, refreshment, or merchandise is merely incidental". The United States conceded that the taxpayers were operating a dance hall. The trial judge submitted the case to the jury on two special issues. First, was "the serving or selling of refreshments or merchandise * * * merely incidental in the operation of The Round-Up, that is, the entire establishment"? The jury answered, "It was not merely incidental". Second, did the plaintiffs include the tax in the price of the refreshments and merchandise? The jury found against the taxpayers on the second issue also. The taxpayers appeal from the denial of their motions for a directed verdict, for judgment, and for judgment notwithstanding the verdict. We affirm. We do not reach the merits of the second issue, however, because we hold that The Round-Up was subject to the cabaret tax.

The starting point for a discussion of the purposes and reach [2] of the cabaret tax properly begins with the entertainment tax Congress enacted in World War I as part of the Revenue Act of 1917, 40 Stat. 300. This was an *admissions* tax on "motion picture shows, theatres, circuses, entertainments, cabarets, ball games, athletic games, etc." "The trouble [was] that to the cabaret no admission fee is directly charged * * * [T]he public pays an admission price, although as Justice Holmes said, it may be disguised in the price of the article sold". Hearings and Briefs before the Committee on Finance, United States Senate, 65th Cong., 1st Sess. at 385, quoted in Geer v. Birmingham, N.D. Iowa, 1950, 88 F.Supp. 189, 196. Congress therefore imposed a tax on such portions of the charges made by cabarets, roof gardens, and similar places as could be attributed fairly to an admission charge. This admissions tax is now imposed under sections 4231(6) and 4232 (b) of the Internal Revenue Code of Code

1954, 26 U.S.C.A. §§ 4231(6) and 4232 (b). These sections were carried over without substantive change from Section 1700(e) of the Revenue Code of 1939, 26 U.S.C.A. § 1700(e).

Section 4231(6) of the Internal Revenue Code of 1954, as it stood during the period with which we are concerned, imposed a twenty per cent tax on "all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit." [3] Section 4232(b) provides that the term "roof garden, cabaret, or other similar place" should include:

> "any room in any hotel, restaurant, hall or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. *In no case shall such term include any ballroom, dance hall, or other similar place where the serving or selling of food, refreshment, or merchandise is merely incidental, unless such place would be considered, without the application of the preceding sentence, as a 'roof garden, cabaret, or other similar place.'*"

The italicized sentence was added by a 1951 amendment to the section's predecessor, Section 1700(e) (1) of the 1939 Code, Section 404 of the Revenue Act of 1951, c. 521, 65 Stat. 452.

The taxpayers rely on the italicized sentence, contending that the receipts in the taxable period are exempt because The Round-Up was a dance hall. They argue that since The Round-Up is concededly a dance hall it is unnecessary to consider the question of whether the selling of refreshments or merchandise was incidental to the operation of The

2. The legislative history is fully discussed in Geer v. Birmingham, N.D.Iowa, 1950, 88 F.Supp., 189 and Landau v. Riddell, 9 Cir., 1958, 255 F.2d 252.

3. Effective as of May 1, 1960, Section 4231 (6) was amended to change the rate of tax from twenty per cent to ten per cent.

Round-Up. The basis of the argument is that the 1951 amendment set up three categories of establishments and that the "incidental" question is pertinent only to establishments falling into the third category, "other similar place". The district judge refused to accept this interpretation of the statute and instructed the jury to determine whether the serving or selling of refreshments or merchandise was incidental to the operation of The Round-Up, noting that the Government conceded the establishment to be a dance hall.

For a number of years the Commissioner has sought to collect a cabaret tax on ballrooms and dance halls where food or refreshments are served. Avalon Amusement Corporation v. United States, 7 Cir., 1948, 165 F.2d 653 was one of the first cases in which a ballroom owner contested the tax. In that case the Seventh Circuit declared that "a hall in which music for dancing is furnished to anyone of the public who is able and willing to pay the admission fee is an establishment furnishing 'a public performance for profit'," and if "refreshments are sold in connection therewith" it is subject to the cabaret tax.[4] Shortly after Avalon, a similar case arose in Iowa. Geer v. Birmingham, N.D.Iowa, 1950, 88 F.Supp. 189. After a careful examination of the legislative and administrative history of the statute and the trade meaning of the term "cabaret", the district court declined to follow the broad interpretation of the tax adopted in Avalon. The court held that a cabaret tax was inapplicable to the particular establishment involved in that suit. The Eighth Circuit followed Avalon, reversing the district court.[5] In 1951 Congress chose to follow the district court in Geer v. Birmingham, and enacted the additional and third sentence to Section 1700(e) (1) (italicized above).

The House Report on the amendment states:

"The purpose of this amendment is to make it clear that the principles set forth by the district court in the case of Geer v. Birmingham ([D.C.] 88 Fed.Supp. 189) are controlling in the determination of whether the establishment involved is operating as a cabaret or as a dance hall, and to avoid the broad construction placed upon the statute in the case of Avalon Amusement Corporation v. United States ([7 Cir.] 165 Fed.2d 653) and in the court of appeals decision reversing the decision of the district court in the Geer case (Birmingham v. Geer [8 Cir.], 185 Fed.2d 82), which requires that dance halls and similar establishments be taxed as cabarets even though the serving or selling of food, refreshments, or merchandise is merely incidental." H.R.Rep. No.586, 82d Cong., 1st Sess. 126 (1951), (1951–52 Cum.Bull. 357, 448).

The direct Congressional reliance on the district court decision in Geer makes the facts and opinion in that case particularly significant. The Laramar Ballroom at Fort Dodge, Iowa, had a dance floor large enough to accommodate 2000 people and had booths and tables with a total seating capacity of 350. It was usually open on Thursday, Saturday, and Sunday evenings from 8:00 P.M. until 12:30 A.M. An orchestra provided music continuously from 8:30 P.M. until closing, with the exception of two ten-minute intermissions. It had no kitchen facilities, but sold refreshments such as soft drinks, popcorn, and peanuts at three fountain counters, charging prices equal to those generally charged at other retail outlets in the area. The Laramar Ball-

---

4. The Avalon Ballroom, 90 feet by 63 feet, also had a stage for an orchestra, a checkroom, booths seating 88 people, plus extra tables, and a barroom "adjacent to and connected with the dance floor but * * * not an integral part of it." No

food was sold. An admission was charged.

5. Birmingham v. Geer, 8 Cir., 1950, 185 F.2d 82, cert. denied, 340 U.S. 951, 71 S.Ct. 571, 95 L.Ed. 686.

room charged admission varying from fifty-five to seventy-five cents. For the year 1948 it derived 67 per cent of its gross income from the admission charges, 27 per cent from the sale of refreshments, and 6 per cent from the operation of a checkroom.

The district court considered the facts of life in the earthy world of night club entertainment. It found that ballrooms such as the Laramar represented a distinct class of establishments that differed uniformly from cabarets in several prominent characteristics.[6] In a nutshell, and as a surprise to no one, the primary attraction of a ballroom or dance hall is dancing. The music plays continuously, or nearly so, and customers come there for the sole purpose of dancing. The owner of the Laramar testified that he did not know of a single instance where a person purchased an admission ticket and did not dance. By contrast, the opportunity to dance is only part of the attraction at a cabaret. The distinguishing feature of the cabaret is its use of the dance music or other entertainment to provide an appealing atmosphere in which the customers may sit, eat or drink, and "watch the show." The customer comes not just to dance, but also to sit and talk; and, of course, from the proprietor's side, the refreshments constitute a far greater source of his revenue than they would at a dance hall. The district court in Geer held that the tax on "cabarets" was not intended to apply to the separate category of establishments comprising "dance halls."

6. In distinguishing between a carbaret and a dance hall, the district court said: "The word 'cabaret' is a French word of unknown origin which has been in use in English-speaking countries since at least the 17th Century. See, The Oxford English Dictionary (Second Edition). In Webster's New International Dictionary (Second Edition) the word is defined as, 'A cafe or restaurant where patrons are entertained by performers who dance and sing after the practice of certain French taverns.' In the Universal Dictionary of the English language the word is defined as, 'Small drinking place or night restaurant in which singing or dancing performances are given.' * * * It appears from the testimony * * * that in the amusement trade the term 'night club' is customarily and ordinarily used as a synonym for 'cabaret.' * * *

"It clearly appears that a ballroom and a cabaret have many different characteristics. A ballroom has a large dance floor generally running from 1500 to 5000 square feet. A cabaret has a small dance floor [generally not larger than] about 15 feet by 30 feet. * * * In a ballroom the dancing space is large in comparison to the rest of the space in the establishment while in cabarets the dancing space is small in comparison to the rest of the space in the establishment. A cabaret provides seating for all of its patrons and only admits those it can seat whereas a ballroom provides seating for only a rather small number of its patrons, generally not exceeding 20 per cent. A cabaret has entertainment separate and distinct from the dance orchestra music. Such entertainment is generally referred to as a floor show. * * * Except of [sic] infrequent occasions a ballroom provides no entertainment separate and distinct from the dance music. * * * A ballroom has a box office where patrons purchase a ticket of admission, and no patrons are admitted without such ticket. Cabarets do not maintain box offices and do not sell tickets for admission. The prices charged by ballrooms for drinks, candy, popcorn, peanuts, and gum are comparable to those charged in ordinary retail outlets. The prices charged by cabarets for food and drinks are greatly in excess of those charged by ordinary establishments vending food and drinks. * * * Ballrooms generally open from around 7:30 P.M. to 9:00 P.M. and generally close at from 12:30 A.M. to 1:30 A.M. * * * Cabarets usually open in the late afternoon and usually stay open several hours longer than do ballrooms. * * * In ballrooms the dance music is usually continuous for a four-hour period except for one or two short intermissions. The total period of such intermission or intermissions is usually from 15 to 20 minutes. In cabarets the music for dancing is intermittent with fairly long and regular intermissions. * * *

It appears that ballrooms throughout the country do in general follow a fairly uniform pattern in their mode and manner of operation and that such pattern has been followed for a fairly long period of time."

The difficulty of applying the tests of Geer to the instant case is that in Geer the opinion did not consider the taxability of a neither-fish-nor-fowl establishment such as The Round-Up. The lower court in Geer contrasted a model form of dance hall to a model form cabaret, and it found as a practical fact that there existed two distinct classes. It had no occasion to discuss the hybrids. For guidance on this question we look to the 1951 statute. It indicates that the hybrids are to be taxed as cabarets. The critical language is the provision that the cabaret tax shall not apply to places "where the serving or selling of food, refreshment, or merchandise is merely incidental." The taxpayers argue that this test is not applicable to an establishment conceded to be a dance hall. We find the language clear, however, that the test applies to every establishment seeking exemption from the cabaret tax under this provision.[7] To meet this requirement the taxpayers must show that the sale of refreshments plays only a supporting role in the entertainment operation; when it assumes importance as a significant attraction for its own sake it is not "merely incidental."[8] The statute thus imposes a standard that generally will be met only by establish-

7. The Government argues that The Round-Up could not qualify as a "dance hall" within the meaning of the exclusionary clause unless its sales of refreshments were "merely incidental." The taxpayers argue that the statute sets up three distinct exemptions (1) ballroom, (2) dance hall, and (3) other similar place where the selling of food and refreshments is merely incidental and that since The Round-Up is admittedly a dance hall, it comes within the exemption. But the phrase, "where the serving or selling of food, refreshment, or merchandise is merely incidental," logically and grammatically operates to limit the terms "ballroom" and "dance hall" as well as "other similar place". This statute does not purport to set out three separate groups of establishments to be exempted. The terms "ballroom" and "dance hall" are virtually synonymous. The word "similar" indicates that the third term was included merely to round out the single group set forth by the first two terms. The word "other" furnishes proof that this is the intended interpretation. The language, "other place where * * *" implicitly states that the establishments previously referred to also possess the quality to be described by the phrase beginning with "where." The last-quoted portion of the Geer opinion indicates the existence of a distinct class of ballrooms and dance halls where dancing is the single attraction and the refreshments are merely incidental. The statutory language seems designed to cover this class and not to reach beyond it. This conclusion is further buttressed by the statement in the House Report already quoted that the purpose of the 1951 amendment was to reverse the rule of the Avalon and Geer Court of Appeals decisions which imposed the cabaret tax "even though the serving or selling of food, refreshments or merchandise is merely incidental." The statement indicates that it was those places where the sale of refreshments is incidental that Congress was principally concerned with.

8. The fact that an establishment is a dance hall does not make it taxable per se. It is necessary to show the serving or selling of food, refreshments, or merchandise is more than "merely incidental." Webster's New International Dictionary (Second Edition) defines the word "incidental" as: "1. Happening as a chance or undesigned feature of something else; casual; hence, not of prime concern; subordinate; as, an *incidental* expense. 2. Liable to happen or to follow as a chance feature or incident; as, the trials *incidental* to married life. * * *" A word has many uses, and "incidental" may have meanings in other contexts different from its meaning in this statute. In the Geer district court decision, which the authors of Section 4232 expressly had in mind as covering an instance when the selling of refreshments was "merely incidental", the sale of refreshments represented 27 per cent of the ballroom's gross revenues and was an integral part of its operations. The quality that was present there was the subordinate relationship of the sale of refreshments to the principal feature of the ballroom, dancing; the refreshments were important as part of the facilities conducive to an enjoyable evening of dancing and not as a significant part of the attraction of the ballroom in and of themselves. We conclude that this subordinate relationship was the meaning intended by Congress in using the term "incidental."

ments closely resembling the model dance hall described in the Geer district court opinion. The Amendment's restriction of the exemption to dance halls where the sale of refreshments is merely incidental tips the scales against many establishments that combine characteristics of the model dance hall and the model cabaret. Only those similar to the model dance hall can qualify for the exemption, as it is written. These are the places that the Amendment was designed to protect from taxation as cabarets, and the Amendment was drawn in a narrow manner that applies only to such cases; at most of the hybrids the sale of refreshments is more than "merely incidental." They therefore continue to be taxed as cabarets notwithstanding the Amendment. This does not eliminate the borderline of close cases; it shifts the borderline closer to the model dance hall. The test is whether the sale of refreshments is subordinate. When such sale becomes important in its own right as a significant part of the attraction of the establishment, the exemption from the cabaret tax will not apply.

In Landau v. Riddell, 9 Cir., 1958, 255 F.2d 252, 257 the Court stated: "Can we say that as a matter of law almost 50% of the income from a business operation is 'merely incidental'? The mere asking of the question indicates that the answer must be 'no,' and demonstrates that under the 'merely incidental' interpretation the facts of the case prevent any recovery by appellant, both as a matter of fact and as a matter of law." In Billen v. United States, 10 Cir., 1960, 273 F.2d 667, 670 the Court declared: "Here the record shows that 50% of the gross revenue came from the sale of food, set-ups and soft drinks. * * * There is no evidence as to whether the public was primarily attracted by the dancing privileges or the food service. It is a reasonable inference that without one there could not have been the other and that they were mutually de-

pendent. Billen testified that the approximate expenditure of each patron was $1.00 of which 50 cents was the admission fee.

Taking into consideration all the facts urged by Billen as proof that the Corn Crib was not subject to the tax, the fact remains that both the dancing and food services were important to the customers. In such circumstances it may not be said that one was 'merely incidental' to the other."

There is no one simple test to determine when the sale of refreshments is "merely incidental." While the relative percentages of gross receipts is probably the most important single index, other factors must also be considered. Both the House and the Senate Reports accompanying the proposed 1951 amendment contained this statement: "This determination will be made by reference to the overall operation of the establishment, including such factors as the relative income from the several activities over a period of time, the relative portion of space devoted to the various activities, the type of refreshments served or sold, the scope and character of the entertainment furnished, and the hours of operation." [9]

Application of these principles to the facts leaves no doubt that the decision of the trial court imposing the cabaret tax should be affirmed. Several objective factors make it entirely clear that the sale of refreshments at The Round-Up was a major business in and of itself. The hall had a seating capacity (615) almost as great as the capacity of its dance floor (750), so that nearly all of its customers could be seated at one time. The bar, which seated fifteen persons, sold beer, domestic wines, set-ups, and soft drinks; but in Texas hard liquor is not sold by the drink and it is customary and legal for customers to bring their own liquor to establishments offering set-ups and soft drinks. The prices charged for the

9. H.R.Rep. No. 586, 82nd Cong., 1st Sess., 126 (1951), 1951–52 Cum.Bull. 357, 448); S.Rep. No. 781, Part 2, 82d Cong., 1st Sess., 69–70 (1951), (1951–52 Cum.Bull. 545, 593).

refreshments were equivalent to prices charged in Dallas at such places as stadia, bowling alleys, and skating rinks. The Round-Up did not have kitchen facilities and did not sell sandwiches; it did sell potato chips, fritos, and the like. It had waitresses to serve those seated at tables. At substantial periods of time (two hours every weekday from 6:00 P.M. to 8:00 P.M. and all Saturday afternoon) The Round-Up was open for the sale of refreshments when no dance band was available. Of particular importance is the fact that a very large portion of its gross revenues, well over half, came from the sale of refreshments. It is obvious that customers were attracted to The Round-Up not only to dance but also to sit at the tables and order refreshments.

The Round-Up's hours of operation were as follows: Mondays through Fridays—Open at 6:00 P.M. and close at 2:00 A.M. of the following morning; Saturdays—Open at 1:00 P.M. and close at 1:00 A.M. Sunday morning; Sundays —Open at 1:00 P.M. and close at midnight. An admission charge, which varied between fifty cents and a dollar depending on the time and on the sex of the entrant, was charged except on Saturdays and Sundays before 6:00 P.M. The cash receipts for admissions to The Round-Up for the period involved totaled $186,570 (or 37.3 per cent of its total revenue), and the receipts from the sale of refreshments for the same period amounted to $314,362 (or 62.7 per cent). The total costs for the purchase of the refreshments sold were $140,451, giving a profit from the sale of refreshments in excess of $170,000, before deductions for wages and overhead. On Mondays through Fridays a band played music for dancing from 8:00 P.M. until 2:00 A.M.; on Saturdays it played from 7:00 P.M. until 1:00 A.M.; and on Sundays it played from 3:00 P.M. to 6:00 P.M. and from 7:00 P.M. until midnight. A nickelodeon was available for use when the band was not playing.

On these stipulated facts there is no permissible inference other than that the sale of refreshments, was more than merely incidental.

The appellant contends that the jury verdict for the Government should be set aside on the ground that the jury was not adequately instructed as to the meaning of "merely incidental." For the reasons already discussed, we hold that in this case a directed verdict for the Government was appropriate; objections to the instructions therefore cannot impugn the judgment. The contention, however, raises a point worthy of note. The determination to be made in this and similar cases is the application of a legal standard to a particular factual situation, a mixed question of law and fact. When the evidentiary facts are stipulated or otherwise not in dispute, the task is one of determining their legal significance. In such a case the scope of review is greater than it is when the credibility of witnesses is involved [10] and the case is accordingly more susceptible to determination by directed verdict or summary judgment. In the close cases— this is not such a case—that fall within the province of the jury, the instructions must fully acquaint the jury with the nature of the legal determination they will be called on to make. If the language of the legal standard contains ambiguity or if the words carry a special meaning that might differ from the meaning of those words in other contexts, the trial judge must give such explanation as is necessary to avoid misunderstanding.[11] Since the legal standard of Section 4232 does carry a precise meaning, cases submitted to a jury involving the section should be accompanied by explanatory instructions.

The judgment is

Affirmed.

10. See Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217.

11. See Jackson v. King, 5 Cir., 1955, 223 F.2d 714, 718.