Ruperto **ROBERTO**, t/a Caborrojeno Caterers, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

No. 66 Civ. 1139.

United States District Court, S. D. New York.

March 29, 1973.

Eisenberg & Solomon, Lake Success, N. Y., for plaintiff; Leonard M. Speier, of counsel.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., for defendant; Joseph D. Danas, V. Pamela Davis, Asst. U. S. Attys., of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVET, District Judge.

This is an action to recover $250.00 paid by plaintiff under protest in partial satisfaction of a cabaret excise tax assessment levied by the District Director of Internal Revenue in the amount of $164,741.77 for the calendar periods from July 1, 1958 through December 31, 1961. The United States counterclaims for the unpaid balance of the as-

sessment, including penalties and interest in the amount of $164,491.77.

The case was tried to the court on November 6, 1972.

After hearing the testimony of the parties, examining the exhibits, the pleadings, the Proposed Findings of Fact and Conclusions of Law, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. This court has jurisdiction over the parties and the subject matter thereto.

2. On April 10, 1964 a federal cabaret tax assessment was made upon plaintiff by the District Director of Internal Revenue pursuant to Section 4231(6) of the Internal Revenue Code of 1954 in the amounts and for the periods as follows:

July 1, 1958 through December 31, 1958

| | | |
|---|---|---|
| Tax | $14,627.33 | |
| Penalty | 3,656.84 | |
| Interest | 4,664.66 | |
| | | $22,948.83 |

January 1, 1959 through December 31, 1959

| | | |
|---|---|---|
| Tax | $39,079.07 | |
| Penalty | 9,769.76 | |
| Interest | 10,671.36 | |
| | | $59,520.19 |

January 1, 1960 through February 28, 1960

| | | |
|---|---|---|
| Tax | $8,311.43 | |
| Penalty | 2,077.85 | |
| Interest | 1,967.40 | |
| | | $12,356.68 |

March 1, 1960 through December 31, 1960

| | | |
|---|---|---|
| Tax | $25,150.48 | |
| Penalty | 6,287.62 | |
| Interest | 5,289.50 | |
| | | $36,727.60 |

January 1, 1961 through December 31, 1961

| | | |
|---|---|---|
| Tax | $23,670.59 | |
| Penalty | 5,917.65 | |
| Interest | 3,600.23 | |
| | | $33,188.47 |
| TOTAL TAX ASSESSMENT | | $164,741.77 |

1. Numbers in parentheses, unless otherwise specified, refer to the stenographic min-

3. On or about June 17, 1965 plaintiff paid the United States the sum of $250.00, representing a $50.00 payment for each assessment period. On April 21, 1966 plaintiff brought this suit for a refund of the $250.00 and defendant counterclaimed in the amount of $164,-491.77. (Pretrial order.)

4. From 1958 through 1961 plaintiff was doing business under the trade name of Caborrojeno Caterers with premises located at 3534 Broadway, New York, New York. The name "Club Caborrojeno" (sometimes referred to herein as the club) appeared on a large neon sign outside the establishment. (89, 106, 125; Ex. E, p. 7.)[1]

5. The total floor area of the club is approximately 10,000 square feet. (119; Ex. 3.) The club's dance floor is approximately 1,862 square feet comprising approximately 19% of the total area of the club. (Ex. 3.) The club's bar and kitchen are approximately 837 square feet, comprising approximately 8% of the area of the club. (Ex. 3.)

6. The total patron capacity of the club is between 350 and 450 persons. There are 121 tables at the club comprised of 103 tables seating four persons and 18 tables seating two persons, thus providing a total seating capacity for 448 persons. The club has a seating capacity at least equal to its total patron capacity, thus affording seating to all who are admitted. (120; Ex. 3.)

7. In order to gain admission to the club a patron must purchase a ticket at a booth on the first floor landing leading to the club. The price of admission ranged from $2.00 to $3.00 per person. The admission price was higher for men than for women. The patron, upon gaining admission, could find his own seat and table or be escorted to one by either Ruperto Roberto or one of his former partners. (11, 12, 43, 89–92, 116; Ex. E, p. 18.)

utes of the trial before this court on November 6, 1972.

8. The Club Caborrojeno offered liquor, beer and soft-drink refreshments to its customers. The beverages were prepared at a bar which was 30 feet long and staffed by three or four bartenders. Liquor and beer were the most popular items. (111; Ex. E, p. 39.)

9. Hot and cold food entrees were served. If a patron desired, he could purchase a cheese ensemble, ham or cheese sandwiches, hot french fried potatoes or a hot Spanish meat pie. (31, 94, 117; Ex. E, p. 25.) The food could be purchased directly at the bar by a patron or at the tables served by waiters. On a Friday, Saturday or Sunday night there would be between four and six waiters to wait on tables. (Ex. E, p. 26.) A patron could order food until the club closed at 3:00 or 3:30 A.M. (127–128.)

\*    \*    \*    \*    \*    \*

10. The club opened at 7:30 PM. and closed between 3:00 and 3:30 A.M. (120, 125–126.)

11. A featured attraction at Club Caborrojeno was its Spanish music and entertainment. At least one orchestra played from 9:30 P.M. until 12:30 A.M. From 1:00 A.M. until 3:00 A.M. piano and guitar "stroll" music was supplied by two musicians. Occasionally, singers who were not members of the orchestra were employed to appear at the club. The appearance of orchestras and vocalists was advertised in local newspapers and on radio. (120–126; Exs. A, E, p. 13.)

12. During the taxable periods in question the percentage of the gross revenue represented exclusively from the sale of refreshments varied from a low of 65.1% to a high of 74.7%. A quarterly breakdown is as follows:

| Year & Quarter | Gross Receipts | Admissions and % | Refreshment and % |
|---|---|---|---|
| 1959 1st | $65,845.62 | $20,345.50—30.8% | $43,933.37—65.4% |
| 1959 2nd | 54,196.94 | 17,233.25—31.8% | 36,397.94—67.1% |
| 1959 3rd | 54,079.38 | 17,918.25—31.2% | 36,002.88—66.5% |
| 1959 4th | 75,943.56 | 25,007.00—33% | 49,324.71—65.1% |
| 1960 1st | 68,557.30 | 21,962.25—32% | 45,001.35—65.6% |
| 1960 2nd | 77,915.55 | 23,561.62—30% | 52,601.81—67.5% |
| 1960 3rd | 79,722.50 | 22,957.98—28.7% | 54,411.27—68.3% |
| 1960 4th | 81,327.78 | 21,836.12—26.8% | 54,810.78—67.3% |
| 1961 1st | 62,872.89 | 14,878.15—23.8% | 42,498.05—67.5% |
| 1961 2nd | 61,056.49 | 16,007.08—26.2% | 44,514.66—72.8% |
| 1961 3rd | 62,584.32 | 15,288.67—24.4% | 46,780.19—74.7% |
| 1961 4th | 84,733.64 | 21,708.47—25.6% | 58,859.93—69.4% |

(Ex. A, No. 4.)

13. During the taxable periods in question the percentage of the gross revenue representing revenue from admissions varied from a low of 23.7% to a high of 33.2%. A quarterly breakdown is as follows:

| Year & Quarter | Gross Receipts | Admissions and % | Other Revenue and % |
|---|---|---|---|
| 1959 1st | $65,854.62 | $20,345.50—30.4% | $45,509.12—69.6% |
| 1959 2nd | 54,196.94 | 17,233.25—31.8% | 36,963.69—68.2% |
| 1959 3rd | 54,079.38 | 17,918.25—33.2% | 36,161.13—66.8% |
| 1959 4th | 75,453.56 | 25,007.00—33.2% | 50,446.56—66.8% |
| 1960 1st | 68,557.30 | 21,962.25—32.1% | 46,595.05—67.9% |
| 1960 2nd | 77,915.55 | 23,561.62—31.5% | 54,353.93—68.5% |
| 1960 3rd | 79,722.50 | 22,957.98—28.8% | 56,764.52—71.2% |
| 1960 4th | 81,327.78 | 21,836.12—26.8% | 59,491.66—73.2% |
| 1961 1st | 62,872.89 | 14,878.15—23.7% | 62,872.89—76.3% |
| 1961 2nd | 61,056.49 | 16,007.08—26.3% | 45,049.41—73.7% |
| 1961 3rd | 62,584.52 | 15,288.67—24.6% | 47,295.85—75.4% |
| 1961 4th | 84,733.64 | 21,708.47—24.5% | 63,025.17—75.5% |

(Ex. A, No. 4.)

14. The revenue derived from admissions did not equal the payroll expense for any taxable quarter in 1960 or 1961 (the only periods for which a payroll expense was provided):

| Year & Quarter | Payroll Expense | Admission Revenue |
|---|---|---|
| 1960—1st | $25,756.00 | $21,962.25 |
| 1960—2nd | 25,892.00 | 23,561.62 |
| 1960—3rd | 24,315.17 | 22,957.98 |
| 1960—4th | 22,439.83 | 21,836.12 |
| 1961—1st | 22,749.50 | 14,878.15 |
| 1961—2nd | 23,348.07 | 16,007.08 |
| 1961—3rd | 22,414.48 | 15,288.67 |
| 1961—4th | 24,089.55 | 21,708.47 |

(Ex. A.)

15. During 1958 through 1961 the price of admission chargel by the club ranged between $2.00 and $3.00 per patron. Since the range of admission is established for each quarter, the range of total revenue derived from admission and non-admission revenue and the range of the number of patrons and the average amount spent by each patron per quarter can be determined:

| Year & Quarter | Admission Charge | Total Admission Revenue | Number of Patrons | Non Admission Revenue | Average Spent Per Patron |
|---|---|---|---|---|---|
| 1959—1st | $2.00 | | 10,102 | | $4.50 |
| | 2.50 | $20,345.50 | 8,146 | $45,509.12 | 5.58 |
| | 3.00 | | 6,782 | | 6.70 |
| 1959—2nd | $2.00 | | 8,617 | | $4.28 |
| | 2.50 | $17,233.25 | 6,893 | $36,963.69 | 5.36 |
| | 3.00 | | 5,744 | | 6.43 |
| 1959—3rd | $2.00 | | 8,959 | | $4.04 |
| | 2.50 | $17,918.25 | 7,167 | $36,161.13 | 5.04 |
| | 3.00 | | 5,973 | | 6.05 |
| 1959—4th | $2.00 | | 12,503 | | $4.04 |
| | 2.50 | $25,007.00 | 10,003 | $50,446.56 | 5.05 |
| | 3.00 | | 8,336 | | 6.05 |
| 1960—1st | $2.00 | | 10,981 | | $4.25 |
| | 2.50 | $21,962.25 | 8,785 | $46,595.05 | 5.30 |
| | 3.00 | | 7,302 | | 6.39 |
| 1960—2nd | $2.00 | | 11,791 | | $4.61 |
| | 2.50 | $23,561.64 | 9,424 | $54,353.93 | 5.78 |
| | 3.00 | | 7,880 | | 6.90 |
| 1960—3rd | $2.00 | | 11,479 | | $4.94 |
| | 2.50 | $22,952.98 | 9,183 | $56,764.52 | 6.18 |
| | 3.00 | | 7,619 | | 7.45 |
| 1960—4th | $2.00 | | 10,913 | | $5.45 |
| | 2.50 | $21,836.12 | 8,734 | $59,491.66 | 6.81 |
| | 3.00 | | 7,279 | | 8.14 |
| 1961—1st | $2.00 | | 7,439 | | $6.45 |
| | 2.50 | $14,878.15 | 5,951 | $47,994.74 | 8.06 |
| | 3.00 | | 4,959 | | 9.67 |
| 1961—2nd | $2.00 | | 8,003 | | $5.63 |
| | 2.50 | $16,007.08 | 6,403 | $45,049.41 | 7.04 |
| | 3.00 | | 5,336 | | 8.44 |
| 1961—3rd | $2.00 | | 7,644 | | $6.19 |
| | 2.50 | $15,288.67 | 6,116 | $47,295.85 | 7.57 |
| | 3.00 | | 5,096 | | 9.28 |
| 1961—4th | $2.00 | | 10,854 | | $5.80 |
| | 2.50 | $21,708.47 | 8,683 | $63,925.17 | 7.26 |
| | 3.00 | | 7,236 | | 8.70 |

(Ex. E, p. 18.)

——————◆——————

16. In summary, I find that Club Caborrojeno is a cabaret within the meaning of 26 U.S.C.A. § 4231(6) and not exempt as a dance hall or ballroom, as defined in 26 U.S.C.A. § 4232(b), from paying an excise tax.

## DISCUSSION

Plaintiff, Ruperto Roberto, transacting business as Caborrojeno Caterers, brings this action to recover the sum of $250.00 which is so much of a federal cabaret tax paid for calendar periods from July 1, 1958 through December 31, 1961. The United States of America has filed a counterclaim to recover the sum of $164,741.77 which is the remaining amount of cabaret taxes, penalties and interest allegedly due but unpaid.

The Commissioner of Internal Revenue assessed the tax, pursuant to 26 U.S.C.A. § 4231(6),[2] after a determination that Club Caborrojeno qualified as a "cabaret" as defined in 26 U.S.C.A. § 4232:

"(b) *Roof garden, cabaret or other similar place*—The term 'roof garden, cabaret, or other similar place,' as used in this chapter, shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. In no case shall such term include any ballroom, dance hall, or other similar place where the serving or selling of food, refreshment, or merchandise is merely incidental, unless such place would be considered, without the application of the preceding sentence as a 'roof garden, cabaret, or other similar place.' "

Plaintiff's right to a refund is pendent upon whether Club Caborrojeno falls within the penumbra "a ballroom, dance hall, or other similar place where the serving or selling of food, refreshment or merchandise is merely incidental."

■ The term "merely incidental" has been the subject of much judicial discussion. However, after consideration, "merely incidental" simply refers to whether or not "[t]he sale of refreshments plays only a supporting role in the entertainment operation; when it assumes importance as a significant attraction for its own sake it is not 'merely incidental' . . . The test is whether the sale of refreshments is subordinate. When such sale becomes important its own right as a significant part of the attraction of the establishment, the exemption from the cabaret tax will not apply." Dance Town, U.S.A., Inc. v. United States, 319 F.Supp. 634, 635 (S.D.Tex), aff'd, 446 F.2d 882 (5th Cir. 1971), quoting from Stevens v. United States, 302 F.2d 158, 163–164 (5th Cir. 1962). See also Shutter v. United States, 406 F.2d 906 (7th Cir. 1969); Billen v. United States, 174 F.Supp. 41 (W.D.Okl.1959); Jones v. Fox, 162 F.Supp. 449 (D.Md. 1958); Kantor v. United States, 154 F. Supp. 58 (S.D.Tex.1956).

■ A ratiocination of whether the serving of food or liquor is "a significant attraction for its own sake" or "merely incidental" to the operation of an entertainment establishment must be approached "in the light of each factual situation as it is presented." Hover v. United States, 158 F.Supp. 179, 183 (S.D. Cal.1958). See also Shutter v. United States, 406 F.2d 906, 908 (7th Cir. 1969); Rokicki v. United States, 164 F.Supp. 610, 614 (N.D.Ohio 1958).

■ A prime factor to be considered is the relationship between gross revenue and revenue derived from the sale of refreshments. "The principal factor to be considered is the source of the revenue." Dance Town, U.S.A., Inc. v. United States, 319 F.Supp. 634, 635 (S.D. Tex.1971); Billen v. United States, 273 F.2d 667 (10th Cir. 1960).

"Can we say that as a matter of law almost 50% of the income from a busi-

2. Until December 31, 1965, when repealed, Section 4231(6) provided:
"(6) Cabarets. A tax equivalent to 10 per cent of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance."

ness operation is 'merely incidental'? The mere asking of the question indicates that the answer must be 'no,' and demonstrates that under the 'merely incidental' interpretation the facts of this case prevent any recovery by appellant, both as a matter of fact and as a matter of law." Landau v. Riddell, 255 F.2d 252, 257 (9th Cir. 1958).

Club Caborrojeno received between 65.1% and 74.7% of its gross income from the sale of food and drink. When an entertainment establishment derives between two-thirds and three-quarters of its gross revenue from the sale of refreshments then the sale is important in its own right and is a significant attraction of the establishment. Incidentally, without the income from refreshment sales the club could not cover its payroll. The payroll is only one expense of plaintiff's doing business. However, it is a significant expense and revenue derived only from admissions could not meet this expense.

In similar cases, where the percentage of gross revenue derived from the sale of refeshments was approximate to that of Club Caborrojeno, courts have determined a cabaret status:

Dance Town, U.S.A., Inc. v. United States
446 F.2d 882 (5th Cir. 1971) .......... 45.1%
Shutter v. United States
406 F.2d 906 (7th Cir. 1969) ......... 47.0%
Luna v. Campbell
302 F.2d 166 (5th Cir. 1962) ........ 60.8%
Stevens v. United States
302 F.2d 158 (5th Cir. 1962) ......... 67.0%
Billen v. United States
273 F.2d 667 (10th Cir. 1960) ........ 50.0%
Anderson v. United States
62–2 U.S.T.C. 15, 415 (D.C.Col.1962) .. 56.0%

█ Revenue derived from the sale of refreshments standing alone strongly indicates that a business is operating as a cabaret, Dance Town, U. S. A. v. United States, supra; Stevens v. United States,

supra; Shutter v. United States, supra; Billen v. United States, supra; Landau v. Riddell, supra, as the case is with Club Caborrojeno. However, other increments of doing business, such as the size of the dance floor and refreshment area, the nature and extent of refreshment service and the nature and hours of entertainment, are helpful in determining the true posture of an entertainment establishment.

The Club Caborrojeno has seating facilities for 448 patrons. The dance floor comprises approximately 19% of the total floor area. Obviously, if a substantial number of patrons on a busy night decide to dance at the same time they could not fit on the dance floor.[3] In Dance Town, U.S.A., Inc. v. United States, supra, 24.3% of the entire floor area was available for dancing. The small size of the dance floor at Club Caborrojeno further indicates that dancing was not the main attraction.

Three or four bartenders prepared liquid refreshments at the club's thirty foot long bar. Hard liquor, as opposed to soft drinks, wine or beer, was the most popular drink. From the kitchen a patron was able to order a cheese ensemble, sandwiches, french fried potatoes or hot Spanish meat pies. All refreshments could be purchased until closing. Though patrons could purchase liquor or food directly at the bar and take such to the table, four to six waiters were available to solicit orders. These factors and circumstances clearly indicate that refreshments were, indeed, an attraction in themselves.[4] Stevens v. United States, supra; Shutter v. United States, supra.

Club Caborrojeno opened its doors for business at 7:30 P.M.; however, the dance music did not commence until 9:00 P.M. The orchestra, which was finally struck up, ceased performing at 12:30

3. There is no evidence that patrons were permitted to dance on table tops.

4. There is no significance in the fact that patrons were required to pay immediately for food or liquor rather than running up a bill.

It is possible to speculate as to the amount of money spent by each patron on refreshments. (See Finding 16.) This indicates that patrons were less concerned about dancing and more concerned about epicurean delights.

A.M., while the club remained open until 3:00 A.M. or 3:30 A.M. After 12:30 A.M. what may be described as "stroll" music was provided by a pianist and guitarist. It seems unusual for a patron to go to a "dance hall" if there is no music to dance to unless, of course, there is some other incentive. Certainly, "[t]his consideration provides additional evidence that plaintiff's sale of food and refreshments so far from being 'merely incidental,' was [Club Caborrojeno's] primary *raison d'etre*. Without food and drink, plaintiff's customers, exhausted by their terpsichorean activities, may well not have lingered along upon the premises before seeking elsewhere an oasis at which to refresh and refuel." Dance Town, U.S.A., Inc. v. United States, 319 F.Supp. 634, 636 (S.D.Tex. 1970).

The facts and circumstances surrounding the operation of Club Caborrojeno clearly indicate a cabaret status within the meaning of 26 U.S.C.A. § 4231(6). Accordingly, this court holds that plaintiff is liable for the excise tax assessed by the government.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter of the litigation and the parties thereto.

2. Plaintiff has failed to prove by a fair preponderance of the credible evidence that it is exempt from payment of a federal cabaret excise tax pursuant to 26 U.S.C.A. §§ 4231(6) and 4232.

3. Hence, the complaint must be dismissed on the merits.

4. The United States of America is entitled to a judgment on its counterclaim against plaintiff in the sum of $164,741.77, which is the amount of cabaret taxes, penalties and interest due from plaintiff for the calendar periods from July 1, 1958 through December 31, 1961.

5. Defendant is entitled to costs and disbursements of this action.

Settle judgment promptly on notice pursuant hereto.