## JLM, INC. *v.* JAMES F. MEEHAN, COMMISSIONER OF REVENUE SERVICES

SUPERIOR COURT        TAX SESSION        FILE NO. 375962

Memorandum filed December 14, 1993

*Brennan & Brennan,* for the plaintiff.

*Anne O'Leary,* assistant attorney general, with whom was *Richard Blumenthal,* attorney general, for the defendant.

BLUE, J.

> A bunch of the yups were whooping it up in
> the Sadies Lounge Saloon;
> The kid that handles the music-box was
> hitting a jag-time tune;
> Back of the bar, inspecting the books, the
> examiner rose to say,
> "If you let them dance on the bar-room
> floor, you've got a cabaret."*

*With apologies to Robert Service.

The question presented in this case is whether the examiner was right. In order to decide this, the rarefied law of taxation must focus both on textual analysis and "the facts of life in the earthy world of night club entertainment." *Stevens* v. *United States,* 302 F.2d 158, 162 (5th Cir. 1962). This case involves Sadies Lounge, a now defunct night club that flourished in the Sheraton Hotel in Waterbury from 1985 to 1989. (JLM, Inc., the plaintiff, owns the Sheraton.)

Sadie did not testify, possibly because she does not exist. The evidence concerning the facts of life in her eponymous lounge came from two accountant types (the hotel controller and the state revenue examiner) who had at one point in the lounge's fleeting existence, loosened their neckties ever so slightly and ventured in. From their testimony it appears that Sadies was pretty tame stuff. It offered a disk jockey (DJ) three nights a week. (The status of the lounge when the DJ was not present is not in controversy.) The DJ would play music, introduce it, entertain requests and encourage patrons to dance. The patrons were primarily hotel guests, although the lounge was also open to the public. Sometimes the DJ would be in a booth and sometimes he would come out to take requests. Drinks were served and people danced. That was pretty much it.

At about the time that the lounge opened, the hotel controller made what might fairly be called a minimal effort to determine whether the lounge was subject to Connecticut's cabaret tax, General Statutes § 12-542. His full testimony on this matter on direct examination was as follows:

"Q. What was the nature of your inquiry?

"A. I called the department of revenue services to find out whether the operation was subject to a cabaret tax at the time.

"Q. As a result of the inquiry, what did you do?

"A. We did not implement the cabaret tax.

"Q. Any other inquiries made?

"A. There was an additional inquiry made by our outside accountant.

"Q. And what did you do as a result of that inquiry?

"A. We did not implement a cabaret tax."

Alas for Sadies. The state later conducted an audit and determined that the cabaret tax was indeed payable. The plaintiff has now appealed to this court.

Two distinct questions of law must now be considered. The first is whether Sadies Lounge was subject to the cabaret tax set forth in § 12-542. If this first question is answered in the affirmative—as I conclude that it must be—the second question that must be addressed is whether the commissioner of revenue services (commissioner), is estopped from collecting the tax. These questions will be considered in turn.

## I

### THE CABARET TAX

Section 12-542 provides in relevant part: "A tax is hereby imposed equivalent to five per cent of all amounts charged for admissions, refreshment, i.e., food and drink, service or merchandise at any cabaret or similar place furnishing music, dancing privileges or any other entertainment for profit during the time or times that such music, dancing privileges or any other entertainment is furnished. . . ."

The phrase "cabaret or similar place" is defined in General Statutes § 12-540 (4), which provides: " 'Cabaret or other similar place' means any room in any hotel, restaurant, hall or other public place where

music, dancing privileges or any other entertainment, except mechanical music alone or the music of a single performer alone, are afforded the patrons in connection with the serving or selling of alcoholic beverages even though the charge made for admission, refreshment, service or merchandise is not increased by reason of the furnishing of such entertainment . . . ."

These two statutes are not perfectly concordant. While § 12-542 refers to a "cabaret or similar place," § 12-540 (4) refers to a "[c]abaret or *other* similar place." (Emphasis added.) Section 12-540 (4) can only refer to § 12-542, however, so no real ambiguity is created by this mistake of draftsmanship. An additional potential for confusion exists because the phrase "music, dancing privileges or any other entertainment" is used in both provisions. Since § 12-540 (4) defines a cabaret as a place that affords its patrons "music, dancing privileges or any other entertainment," what is the point of repeating that phrase in § 12-542? Although the drafting could have doubtless been made less confusing, the point seems to be that under § 12-542, the music, dancing privileges or other entertainment must be furnished "for profit" in order to be taxable. There is, however, no doubt in this case that Sadies Lounge furnished music and dancing privileges to its patrons for profit. Consequently, if Sadies Lounge is a cabaret or similar place as defined by § 12-540 (4), its taxability under § 12-542 is clearly established. For this reason, it is necessary that § 12-540 (4) be examined in some detail.

The taxpayer and the commissioner have specifically focused on the provision of § 12-540 (4) that defines a cabaret or similar place as a room that affords its patrons "music, dancing privileges or any other entertainment, except mechanical music alone . . . ." The textual question presented is, what does the phrase "except mechanical music alone" modify? The commis-

sioner argues that it modifies only the word "music," so that if the music is mechanical, one must still inquire whether the establishment in question affords its patrons "dancing privileges or any other entertainment." Since Sadies Lounge unquestionably afforded its patrons dancing privileges, it follows, according to the commissioner, that the lounge was a cabaret or similar place.

The taxpayer's construction of § 12-540 (4) is driven more by practical concerns than by textual analysis. In the taxpayer's view, "people ordinarily dance to music." Consequently, if people dance to mechanical music, the taxpayer reasons that the statutory exemption for mechanical music is satisfied.

Purely as a matter of textual construction, the taxpayer's analysis is problematic. While the phrase "except mechanical music alone" can sensibly modify the word "music," it can hardly modify the term "dancing privileges." If the legislature had intended to exempt establishments that afford their patrons the opportunity to dance to mechanical music, it could easily have done so. Moreover, to the extent that the phrase "except mechanical music alone" is ambiguous, it sets forth a tax exemption and, therefore, must be construed in favor of the state. *Altray Co.* v. *Groppo,* 224 Conn. 426, 432, 619 A.2d 443 (1993). In any event, the taxpayer's argument that people ordinarily dance to music, while accurate as far as it goes,[1] overlooks the most sensible, practical construction of the exemption for mechanical music: namely that it was intended

---

[1] Although most dancing in ordinary experience is unquestionably done to music, it is entirely possible to dance without music. Some forms of modern dance are performed without music, and, of course, one can dance unaccompanied by music out of sheer joy. (Snoopy occasionally does this in the *Peanuts* comic strip.)

to exempt restaurants and similar establishments with mechanical *background* music and no dancing privileges at all.[2]

This analysis is confirmed by a substantial body of federal judicial authority. The statutory exception for "mechanical music alone" was taken verbatim from the definitional section of a federal admissions tax. Title 26 of the United States Code § 4231 (6) (repealed 1965) had imposed "[a] tax equivalent to 20 percent of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit . . . ." Title 26 of the United States Code § 4232 (b) (also repealed 1965) defined the term "roof garden, cabaret, or other similar place" as "any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. . . ." When the language of one of our tax statutes is nearly identical to a federal tax law, "federal tax concepts are incorporated into state law," and "we may therefore look to federal decisional law to guide our interpretation" of the state statute. *Commissioner of Revenue Services* v. *Peska,* 220 Conn. 77, 83, 595 A.2d 348 (1991).

The federal admissions tax has a somewhat complex history. It was originally enacted during World War

[2] This was alluded to in legislative remarks concerning Public Acts 1972, No. 72-88, which amended General Statutes § 12-540 (4) to additionally exempt "the music of a single instrumental performer alone." The house sponsor of the bill explained that this amendment was necessary to reemploy a number of musicians "who had lost their jobs as a result of the Cabaret Tax being applied to the places where they were furnishing background music." 15 H. R. Proc., Pt. 4, 1972 Sess., p. 1448, remarks of Representative Darius J. Spain.

I as a war tax on admissions, contained in the War Revenue Act, c. 63, 40 Stat. 300, 318 (1917). That act imposed a tax on amounts paid "for admission to any public performance for profit at any cabaret or other similar entertainment to which the charge for admission is wholly or in part included in the price paid for refreshment, service, or merchandise." The term "any cabaret or other similar entertainment" was not defined. Apparently no definition was thought necessary. A Senate report on the bill simply stated a purpose "to impose a tax upon admissions to what are commonly known as cabarets . . . ." S. Rep. No. 103, 65th Cong., 1st Sess. 12 (1917).

What was "commonly known" to the Senate in 1917 is now unknowable. The word "cabaret" is a French word of unknown origin that simply referred to a "drinking house." 2 New English Dictionary on Historical Principles (1893) p. 8.[3] By 1920, Webster's Dictionary, which defined a "cabaret" as a "tavern," referred to the term as obsolete or rare, "except of a French drinking house." Webster's New International Dictionary of the English Language (1920). There is, however, no indication that the war tax on admissions was intended to apply only to drinking establishments of the French persuasion. Rather, the tax was made applicable to "any cabaret or other *similar* entertainment."[4] (Emphasis added.) Because of this phraseology, "[t]he use of the phrase 'cabaret tax' is, in and of itself, misleading. . . .'Entertainment Tax' would be more appropriate . . . ." *Jones* v. *Fox*, 162 F. Sup. 449, 459–60 (D. Md. 1957).

---

[3] Pepys' Diary for September 23, 1662, records that: "In our coming home, Sir G. Carteret told me how in most *Cabaretts* in France they have writ upon the walls, in fair letters to be read, *Dieu te regarde* as a good lesson to be in every man's mind." 3 R. Latham & W. Matthews, The Diary of Samuel Pepys (1970) p. 204.

[4] In like manner, General Statutes § 12-542 imposes a tax on "any cabaret or *similar* place." (Emphasis added.)

The War Revenue Act became law on October 3, 1917. Two months later, on December 4, 1917, the United States Treasury Department released an administrative definition of the statutory term "any cabaret or other similar entertainment." That definition was as follows: " 'Cabaret or other similar entertainment' includes every hotel, restaurant, hall, or other public place at or in which, in connection with the service or sale of food or other refreshment or merchandise, there is conducted any vaudeville or other performance or diversion in the way of acting, singing, declamation, or dancing, either with or without instrumental or other music. Every form of entertainment so conducted is included, except that furnished by orchestras performing instrumental music only, unaccompanied by any other form of entertainment. A hotel, restaurant, or hall affording, in connection with the service of refreshment, food, or merchandise, entertainment in the form of dancing by its patrons is included." T.D. 2603, 19 Treas. Dec. Int. Rev. 370, 371 (1917). In the following year, this definition, with minor changes in phraseology, was incorporated in a formal regulation. Treas. Reg. 43 (1917), set forth in T.D. 2681, 20 Treas. Dec. Int. Rev. 93, 98 (1918).

Over the next twenty-three years, Treasury Regulation 43 was continually expanded. Its various manifestations are exhaustively set forth in *Geer* v. *Birmingham,* 88 F. Sup. 189, 198–210 (N.D. Iowa), rev'd, 185 F.2d 82 (8th Cir. 1950), cert. denied, 340 U.S. 951, 71 S. Ct. 571, 95 L. Ed. 686 (1951), and that history need not be repeated here. It can be readily seen, however, both from the Treasury Department's original ruling published in 1917, and from the numerous illustrations set forth in *Geer* v. *Birmingham,* supra, that the Treasury Department consistently took the position that the admissions tax applied to a wide variety of establishments offering dancing privileges. It is

of the utmost importance to note that the 1917 ruling drew a sharp distinction between "dancing, either with or without instrumental or other music," which was taxable, and "instrumental music only, unaccompanied by any other form of entertainment," which was not.

In 1942, Congress amended the admissions tax statute to provide, for the first time, a statutory definition of the term "cabaret or similar place." A tax was imposed on "all amounts paid for admission, refreshment, service or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit . . . ." The term " 'roof garden, cabaret, or other similar place' " was defined to include "any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. . . ." Revenue Act of 1942, c. 619, 56 Stat. 798, 981 (1942). The legislative reports from both houses accompanying this act state that, "[t]he amendment confirms the Treasury Department's interpretation of the present statute . . . ." H.R. Rep. No. 2586, 77th Cong., 2d Sess. 79 (1942); S. Rep. No. 1631, 77th Cong., 2d Sess. 268 (1942).

The statutory exception for "mechanical music alone" was thus created by the 1942 act. Shortly thereafter, the Treasury Department amended its regulations to provide in part as follows: "Where music, whether by an orchestra, a mechanical device, or otherwise, and a space in which the patrons may dance is furnished in the dining room of a hotel, or in a restaurant, bar, etc., the entertainment constitutes a public performance for profit at a roof garden, cabaret or similar place, and the payments made for admission, refreshment, service, and merchandise are subject to the tax." T.D. 5192, 1942–2 C.B. 249, 250.

Following these developments, the federal courts were presented with numerous cases involving establishments that allowed their patrons to dance to instrumental or mechanical music. None of the resulting decisions construed the 1942 amendment in the manner advocated by the taxpayer in the present case. The provision of dancing privileges remained a fact of taxable significance, even where the accompanying music could be described as "instrumental or mechanical music alone." These cases involved, variously, bands or orchestras (providing "instrumental . . . music alone"), and, jukeboxes (providing "mechanical music alone.") The Seventh Circuit held early on in a much cited orchestra case that "[a]n establishment charging admission for dancing privileges and where refreshments are sold in connection therewith is a 'roof garden, cabaret, or other similar place.' " *Avalon Amusement Corp.* v. *United States,* 165 F.2d 653, 654 (7th Cir. 1948); accord *Birmingham* v. *Geer,* supra, 185 F.2d 87–88; see *Stevens* v. *United States,* supra, 302 F.2d 162.

The federal cases involving jukeboxes are particularly relevant to the present case since people who dance to jukeboxes do so to "mechanical music alone." These cases are in harmony, so to speak, with the band and orchestra cases just described. Given the seminal early decisions in *Avalon* and *Birmingham,* it was considered "inevitable that where an establishment furnished music and dancing privileges in connection with the selling of food and drink . . . the receipts therefrom are subject to the so-called cabaret tax . . . the absence of entertainment other than dance music . . . notwithstanding." *Jones* v. *Fox,* supra, 162 F. Sup. 461–62; accord *United States* v. *Ritchie,* 327 F.2d 732, 736 (5th Cir. 1964); *Billen* v. *United States,* 273 F.2d 667, 670 (10th Cir. 1960); *Crapps* v. *Duehay,* 208 F. Sup. 344,

349 (E.D. S.C. 1962); *Christie* v. *United States,* 179 F. Sup. 709, 717 (D. Or. 1959); *Baldwinson* v. *United States,* 80 F. Sup. 687, 689 (W.D. Wash. 1948). The presence of "dancing privileges" was held sufficient to incur tax liability. In order to avoid such liability, an establishment with a jukebox and a dancing floor had an affirmative obligation "constantly and in good faith" to prevent or to stop "attempted dancing." *Christie* v. *United States,* supra, 717.

The rationale for these decisions was that, "the act expressly excludes places where mechanical music alone is furnished, but when a place for dancing is added, mechanical music alone is no longer furnished and this exclusion is no longer effective to bring an establishment out from the coverage of the statute." *United States* v. *Ritchie,* supra, 327 F.2d 736. I cannot improve upon this language, which is directly applicable to the present case, and I gratefully adopt it.

For the reasons stated above—my textual analysis of the cabaret statute, the fact that the "mechanical music alone" provision sets forth a tax exemption and, therefore, must be narrowly construed against the taxpayer, and the pertinent federal decisional law on the identical statutory issue—I conclude that because Sadies Lounge afforded its patrons dancing privileges in addition to mechanical music, it was a "cabaret or similar place" and, therefore, subject to the cabaret tax.

## II

### THE ESTOPPEL ISSUE

The taxpayer's claim that assuming it was subject to the cabaret tax, the commissioner is estopped from collecting that tax, can be disposed of rather briefly. It is true, as the taxpayer asserts, that estoppel may be invoked against a governmental agency "where the party claiming estoppel would be subjected to a sub-

stantial loss if the public agency were permitted to negate the acts of its agents." *Kimberly-Clark Corp.* v. *Dubno,* 204 Conn. 137, 147, 527 A.2d 679 (1987). But "estoppel against a public agency is limited and may be invoked: (1) only with great caution; (2) only when the action in question has been induced by an agent having authority in such matters; and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency." Id., 148.

The evidence presented in this case is so sketchy that it does not meet this test or, for that matter, the tests generally applicable to estoppel cases. See *Iowa Movers & Warehousemen's Assn.* v. *Briggs,* 237 N.W.2d 759, 769 (Iowa), cert. denied, 429 U.S. 832, 97 S. Ct. 94, 50 L. Ed.2d 96 (1976). "It is the burden of the party asserting a claim of estoppel to establish the existence of the elements essential to an estoppel . . . and whether that burden has been satisfied in a particular case is an issue of fact." (Citation omitted.) *Middlesex Mutual Assurance Co.* v. *Walsh,* 218 Conn. 681, 699, 590 A.2d 957 (1991). The taxpayer here simply has not met this burden.

The hotel controller made only the barest assertions concerning his telephone call to the department of revenue services and the subsequent inquiry by the "outside accountant." He failed to identify the person with whom he spoke, the specific terms of his inquiry, the terms of the response, or, for that matter, the existence of a response, or the authority of the person to bind the commissioner. The taxpayer made no written request for information and made no attempt to obtain a written ruling. This lack of clear evidence necessitates a finding that the taxpayer has failed to meet its burden of proof. See *Video Tape Exchange Co-op of America, Inc.* v. *Indiana Dept. of State Revenue,* 533 N.E.2d 1302, 1304–1305 (Ind. 1989). Under these cir-

cumstances, the commissioner cannot be estopped from collecting the tax that is otherwise legally due.

## III

### CONCLUSION

For the reasons stated above, the appeal is dismissed.

